Loretta ROLLAND, et al., Plaintiffs,

v.

Argeo Paul CELLUCCI,
et al., Defendants.

No. Civ.A.98–30208–KPN.

United States District Court,
D. Massachusetts.

May 3, 2002.

**26**

Peter T. Wechsler, Attorney General's Office, Boston, MA, Judith S. Yogman, Attorney General's Office, Government Bureau, Boston, MA, H. Gregory Williams, Attorney General's Office, Springfield, MA, Ginny Sinkel, Office of the Attorney General, Government Bureau, Boston, MA, Thomas B. York, Dilworth Paxson, LLP, Harrisburg, PA, for Defendants.

Phillip Kassel, Massachusetts Correctional Legal Services, Boston, MA, John Reinstein, Civil Liberties Union of Massachusetts, Boston, MA, Daniel S. Manning, Greater Boston Legal Services, Boston, MA, Allan G. Rodgers, Mass Law Reform Institute, Boston, MA, J. Paterson Rae, Western Mass. Legal Services, Springfield, MA, James Breslauer, Neighborhood Legal Services, Inc., Lawrence, MA, for Interested parties.

*MEMORANDUM AND ORDER WITH REGARD TO PLAINTIFFS' AMENDED MOTION FOR FURTHER RELIEF CONCERNING SPECIALIZED SERVICES (Docket No. 243)*

NEIMAN, United States Magistrate Judge.

Presently before the court is Plaintiffs' amended motion for further relief concerning specialized services. Plaintiffs comprise a class of developmentally disabled and mentally retarded individuals in Massachusetts nursing homes. Their motion arises directly from this court's March 27, 2001 finding, that Defendants, various state officials, had failed to substantially comply with that part of the parties' settlement agreement governing the provision of specialized services to members of Plaintiffs' class. As a result of its finding, the court lifted the stay imposed by the settlement agreement and agreed to address the propriety and extent of further relief. As

Richard D. Belin, Nima R. Eshghi, Foley, Hoag & Eliot, Boston, MA, Steven J. Schwartz, Center for Public Representation, Northampton, MA, Cathy E. Costanzo, Center for Public Representation, Northampton, MA, Stacie B. Siebrecht, Disability Law Center, Boston, MA, Frank J. Laski, Mental Health Legal Advisors Committee, Christine M. Griffin, Disability Law Center, Boston, MA, Thomas B. York, Dilworth Paxson, LLP, Harrisburg, PA, Matthew Engel, Disability Law Center, Northampton, MA, for Plaintiffs.

described below, the court believes that certain relief is necessary to ensure that Plaintiffs are provided services to which they are entitled under the settlement agreement. It will, therefore, allow Plaintiffs' motion.

## I. BACKGROUND

The court will not describe the factual and procedural background of this matter, it having done so in prior memoranda. *See Rolland v. Cellucci,* 164 F.Supp.2d 182 (D.Mass.2001); *Rolland v. Cellucci,* 191 F.R.D. 3 (D.Mass.2000); *Rolland v. Cellucci,* 52 F.Supp.2d 231 (D.Mass.1999).[1] Suffice it to say for purposes here that on June 4, 1999, the court denied Defendants' motions to dismiss Plaintiffs' class action, which was brought pursuant to 42 U.S.C. § 1983 ("section 1983") and the Nursing Home Reform Act ("NHRA"), 42 U.S.C. § 1396r. *See Rolland,* 52 F.Supp.2d 231. Then, on January 10, 2000, the court approved the parties' settlement agreement (Docket No. 115), thus making it an order of the court. The implementation of certain aspects of the agreement, over which the court has retained jurisdiction, is currently at issue.

By its own terms, the settlement agreement, although approved by the court, is "not ... enforceable by contempt or by a breach of contract action in state or federal court." (Settlement Agreement ¶ 27.)

Rather, the agreement obligates Plaintiffs to attempt mediation and, if unsuccessful, to "file a motion with the Court seeking a judicial determination that Defendants are not substantially complying with the Agreement." (*Id.* ¶ 32.) If the court so finds, "it may lift the stay otherwise imposed under paragraph [twenty-eight] and the Plaintiffs may seek injunctive and other relief based upon the then existing facts and law." (*Id.* ¶ 32.)[2]

The present issue concerns Defendants' compliance with paragraphs fifteen and sixteen of the settlement agreement. Taken together, these two paragraphs obligate Defendants to provide class members specialized services identified through a process known as preadmission screening and annual resident review ("PASARR").[3] The PASARR process prohibits nursing facilities participating in the federal Medicaid program from admitting an individual who is mentally ill or retarded unless the state has first determined, before admission, that the prospective resident requires the level of services provided by the facility and whether the individual requires "specialized services." *See* 42 U.S.C. § 1396r(b)(3)(F). PASARR applies to all potential residents whether or not they are Medicaid-eligible. *See* 57 Fed.Reg. 56450, 56452 (Nov. 30, 1992). The PASARR pro-

---

1. *See also Rolland v. Cellucci,* 151 F.Supp.2d 145 (D.Mass.2001); *Rolland v. Cellucci,* 138 F.Supp.2d 110 (D.Mass.2001); *Rolland v. Cellucci,* 106 F.Supp.2d 128 (D.Mass.2000).

2. The settlement agreement's stay provision, paragraph twenty-eight, simply states that "[f]urther proceedings in [this action] will be stayed, subject to the [agreement's enforcement] provisions." (*Id.* ¶ 28.)

3. In their entirety, the paragraphs provide as follows:
 15. Of the 858 nursing facility residents, according to the PASARR evaluators, who were not receiving all specialized services recommended in their PASARR evaluations as of July 1, 1998, the Defendants shall provide or arrange for those specialized services to all such residents by December 31, 1999.
 16. For all other Massachusetts residents who are class members whose PASARRs recommend specialized services, Defendants shall provide or arrange for the provision of those specialized services by April 30, 2000, or within 90 days of the individual's admission to a nursing facility, whichever is later.
 (*Id.* ¶¶ 15, 16.)

cess also requires regular reviews of all such residents. *See* 42 U.S.C. § 1396r(b).

On September 26, 2000, after mediation with respect to paragraph fifteen and sixteen of the settlement agreement proved unsuccessful, Plaintiffs filed a Motion for Further Relief Concerning Specialized Services (Docket No. 159) in which they argued that a significant number of class members were not receiving all, and that some class members were not receiving any, of the specialized services they were determined to need. On March 27, 2001, the court allowed the motion to the extent it sought a finding of substantial noncompliance as of June 30, 2000, and lifted the stay with respect to paragraphs fifteen and sixteen of the settlement agreement. *See Rolland*, 138 F.Supp.2d at 120. The court also granted Plaintiffs leave to "seek injunctive and other relief based upon the then existing facts and law." *Id.*

Plaintiffs filed the instant motion for further relief—which technically amends their September 26, 2000 motion—on August 26, 2001. In November of 2001, following an agreed-upon period of discovery, the court held a four day evidentiary hearing. Thereafter, the parties filed proposed findings of fact and additional memoranda of law and the court heard oral argument on January 23, 2002. In some contrast to Plaintiffs' initial motion for further relief, the parties agreed that August 31, 2001, should be the measuring date with respect to the present motion.

## II. *Discussion*

As discussed in part B *infra*, the court makes specific findings of fact and conclusions of law with respect to Defendants' compliance with federal law concerning the provision of specialized services. In summary, the court believes that Defendants have not adequately provided specialized services and, therefore, further relief is appropriate. The particulars of that relief

are spelled out in part C. Before describing the ordered relief, however, the court will address in part A a number of preliminary matters.

## A. *Preliminary Issues*

Although Defendants assert in their memorandum that "[t]he sole issue in this case is whether the Commonwealth is in compliance with federal law concerning the provision of specialized services," (Docket No. 316, Defendants' Trial Brief ("Defs.' Brief"), at 1), they have raised five preliminary challenges to Plaintiffs' motion which go well beyond this narrow scope: (1) whether Plaintiffs even have a privately enforceable right to specialized services under the NHRA; (2) whether the NHRA's implementing regulations go too far beyond the statute; (3) whether the NHRA is even subject to judicial enforcement; (4) whether an "active treatment" standard is so ill-defined as to make Defendants' obligations with respect thereto impossible to discern; and (5) whether certain evidentiary "failures" eviscerate Plaintiffs' position. The court will consider these five questions in turn.

### 1. *Do Plaintiffs have a privately enforceable right to specialized services under the NHRA?*

Defendants first assert that Plaintiffs do not have a privately enforceable right to specialized services under the NHRA. Relatedly, Defendants contend that the term "specialized services" is too vague and amorphous to be enforceable. The court rejected these same arguments in its decision denying Defendants' motions to dismiss. In essence, the court found that section 1983 was an appropriate vehicle for Plaintiffs to vindicate their NHRA-based right to specialized services. *See Rolland*, 52 F.Supp.2d at 234–36. To leave no lin-

gering doubt, the court revisits these matters, albeit briefly.

■ There are three factors to consider in determining whether a particular statutory provision gives rise to a federal right: (1) whether Congress intended the provision to benefit the plaintiffs; (2) whether the right "is not so 'vague and amorphous' that its enforcement would strain judicial competence" and (3) whether the provision unambiguously imposes a binding obligation on the states. *Blessing v. Freestone,* 520 U.S. 329, 340–41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). As for the first factor, there is no question but that Congress intended that the NHRA benefit members of Plaintiffs' class. Defendants do not contend otherwise.

With regard to the second factor, the right to specialized services, in the court's view, "is not so 'vague and amorphous' that its enforcement would strain judicial competence." *Id.* at 341, 117 S.Ct. 1353. *See Rolland,* 52 F.Supp.2d at 235–36. As the court previously noted, and as remains true now, Defendants' very assertion that they comply with the "specialized services" standard is proof enough "that the term . . . is [not] so nebulous and ill-defined" as

to preclude judicial enforcement. *Rolland,* 52 F.Supp.2d at 235.

Finally, as for the third factor, it is clear that the NHRA unambiguously imposes a binding obligation on the states. *See id.* at 234–36. As Plaintiffs point out, the NHRA was informed by a history of states neglecting and warehousing persons with mental disabilities in nursing facilities. *See* H.Rep. 100–391(I) at 459, 100th Cong. 1st Sess. (1987), 1987 U.S.C.C.A.N. 2313–1, 2313–279, 1987 WL 61524 (Leg.Hist.) (documenting that "substantial numbers of mentally retarded and mentally ill residents [in Massachusetts and other states] are inappropriately placed" in nursing facilities and "do not receive the active treatment or services that they need"). To prevent the indiscriminate transfer of individuals with mental retardation to nursing homes, Congress mandated that states provide active treatment to such nursing facility residents deemed in need. *See* 42 U.S.C. §§ 1396r(e)(7)(A), (B)(ii) and (C).

Defendants' present reliance on *Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), decided after Defendants' motions to dismiss were denied, does not convince the court otherwise.[4] *Sandoval* involved the private en-

---

4. *Sandoval,* by the way, presents the only grounds upon which Defendants may appropriately argue that a "change" in the law requires the court to take a second look at its previous conclusions. In this regard, the following colloquy between the court and Defendants' attorney is instructive:

MR. WECHSLER: And there are, of course, various enforcement provisions that the plaintiffs have if they're dissatisfied with the implementation of this agreement. One is to confer. A second is mediation. And then they have the various rights to go back into this court if they're dissatisfied.

THE COURT: Right, and I think that it's within those paragraphs that I saw something that could be interpreted, *then existing facts and law,* something along those lines that take that at least kinds of changes into account.

MR. WECHSLER: Right, so that the agreement is between the parties. But if the plaintiffs were dissatisfied and believed that the defendants are not carrying out their obligations, they have the right to go back into court. And at that point, to argue that there's a violation of then applicable law. So, for example, if the defendants don't meet the schedule for placement within a period, the plaintiffs can go back on that basis and reopen the case with the state and argue that the defendant's practices violate the law.

So that it places them in the same position that they would be absent an agreement in terms of enforceability. They could make that claim at that time. And the court would, of course, be considering any changes in facts or law, for example, but facts may well change at that point in terms

forceability of certain agency regulations promulgated pursuant to the Civil Rights Act of 1964. The Supreme Court found that because the regulations proscribed what the statute permitted, Congress could not have intended to create a private right of action to enforce them. *See id.* at 281–82, 121 S.Ct. 1511. This conclusion was reinforced by the fact that the regulations directly addressed actions by federal agencies, not benefits or entitlements of private individuals. *See id.* at 289–90, 121 S.Ct. 1511. In addition, the Court found that the existence of elaborate restrictions belied any inference that Congress intended to create a private right of action with respect to the promulgated regulations. *See id.* at 289–92, 121 S.Ct. 1511.

These rationales are inapposite here. First, the NHRA, in obligating states to provide specialized services to certain nursing home residents, does not preclude what its regulations permit. *See Rolland,* 52 F.Supp.2d at 235. Rather, the regulations clarify and amplify what Congress imposed, i.e., an obligation on states to provide specialized services to residents of nursing facilities who have been determined to need that level of care by the statutorily mandated assessment procedures. Second, as indicated, there is little question but that the NHRA was intended to protect individuals with disabilities. The NHRA was designed to ensure that persons with mental disabilities were not inappropriately admitted to, or retained in, nursing facilities by the states and, to accomplish that end, afforded individualized protections for those determined to be in need of specialized services. *See* 42 U.S.C. § 1396r(7)(C). Third, the absence of an agency enforcement mechanism with respect to the provision of specialized services supports rather than undermines the inference of a private right of action. *Compare Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 68–69 (1st Cir.2002) (no private right of action under Family Educational Rights and Privacy Act in light of specific remedy accorded Secretary of Education).

Any remaining doubt about *Sandoval's* inapplicability is dispelled by the fact that Plaintiffs' claims were also brought pursuant to section 1983 which, of course, provides an independent avenue for private enforcement of a federal law such as the NHRA. *See Evans v. Avery,* 100 F.3d 1033, 1036 (1st Cir.1996); *Boulet v. Cellucci,* 107 F.Supp.2d 61, 71–73 (D.Mass.2000). The plaintiffs in *Sandoval,* in contrast, did not advance a section 1983 cause of action.[5] In short, for the reasons stated, the court still believes that Plaintiffs have a privately enforceable right to "specialized services."

2. *Do the administrative regulations go beyond the statute?*

■ The court is equally disinclined to accept Defendants' renewed argument that the implementing regulations go beyond the NHRA and are, therefore, ultra vires. Accordingly, the court's prior conclusion—that Congress did not foreclose, and the Secretary of Health and Human Services ("Secretary") properly construed Congressional intent to impose, a duty to provide specialized services to all nursing facilities

---

of who's already been placed and there may be legal developments.
(Docket No. 118, Transcript of October 20, 1999 Conference at 23–24 (emphasis added). See also *id.* at 42–43.)

**5.** The *Sandoval* dissent suggested that, on remand, the plaintiffs might be able to invoke section 1983 in order to obtain relief, *see id.,* 532 U.S. at 300–01, 121 S.Ct. 1511 (Stevens, J., dissenting), but the majority did not address that point.

residents found to be in need—will stand. *See Rolland,* 52 F.Supp.2d at 235.

In order to prevent the denial of adequate care, Congress mandated that all persons with mental retardation and related conditions be screened before admission to a nursing facility, *see* 42 U.S.C. § 1396r(e)(7)(A), and that a determination be made whether the individual requires specialized services, *see* 42 U.S.C. § 1396r(e)(7)(B)(ii)(II). Moreover, states were obligated to provide such services to persons who were not in need of nursing facility services only. *See* 42 U.S.C. § 1396r(e)(7)(C). Congress also required that persons who had been in a nursing facility for less than thirty months, and those who had resided there longer and who chose to leave, be provided not only specialized services but a discharge to an appropriate placement. *See id.* In effect, Congress prioritized its goals by obligating states to facilitate an alternative placement of persons who needed specialized services and to provide specialized services in the interim. Finally, Congress specifically entrusted the Secretary to promulgate regulations which gave meaningful and practical application to its intent. *See* 42 U.S.C. § 1396r(f). In the court's opinion, the Secretary's regulations appropriately reflect these statutory mandates, many of which, by the way, are reflected in the parties' settlement agreement.

3. *Is the statute subject to judicial enforcement?*

 As a third line of defense, Defendants point to the court's statement in its ruling on their motion to dismiss—that "the question of judicial enforcement of the NHRA is for another day"—as justification for its reconsidering now the enforceability of Plaintiffs' rights. This argument reads too much into the court's remark.

What the court reserved for another day was not whether the NHRA was enforceable by private citizens—the court having concluded that it was—but what remedy might be appropriate were Plaintiffs to prove that Defendants were not in compliance with their statutory and regulatory obligations. However, even that question faded when the parties entered into their settlement agreement which, as indicated, became an order of the court on January 10, 2000.

As far as the court is concerned, Defendants, when executing the settlement agreement, not only recognized their duty to provide class members with specialized services under the NHRA, but Plaintiffs' right to enforce that duty as well. By its very terms, the agreement recognized that the parties entered into their settlement in order "to resolve the issues raised in the Plaintiffs' Amended Complaint and the Defendants' Answer by providing specialized services and residential supports to the plaintiff class members pursuant to the provisions [here]of." (Settlement Agreement ¶ 1.) At the present time, the court "can discern no sound reason that [Defendants] like any other litigant who knowingly and voluntarily stipulates to judgment, should not be bound by the obligations undertaken in the [settlement agreement], which obligations plainly constituted the consideration that prompted [Plaintiffs] to settle their ... action against [Defendants]." *Whitehouse v. LaRoche,* 277 F.3d 568, 578 (1st Cir.2002).

4. *Is an "active treatment" standard so ill-defined as to make Defendants' obligations with respect thereto impossible to discern?*

 Yet another roadblock which Defendants attempt to construct to defeat Plaintiffs' motion is their claim that an "active treatment" standard, as distinct

from "specialized services," is so ill-defined as to make their obligations with respect thereto impossible to discern. This argument has several layers, none of which, in the court's view, precludes a finding that Defendants have failed to provide services in the manner contemplated both by the NHRA and the parties' agreement.

As an initial matter, Defendants argue that the use of the active treatment standard by the Massachusetts Department of Mental Retardation ("DMR"), through its designated agent, MetroWest, ought not be deemed any sort of admission on their part. Indeed, throughout the course of their opposition to Plaintiffs' motion, Defendants have tried their best to distance themselves from MetroWest. In any case, Defendants assert, the interpretation of NHRA requirements is not a factual issue amenable to such an admission, but a legal issue to be determined by the court.

In pursuing this argument, Defendants fail to acknowledge that the court, when issuing its March 27, 2001 ruling, concluded as a matter of law that the "active treatment" standard was required not only by the NHRA but by the terms of the settlement agreement. *See Rolland,* 138 F.Supp.2d at 115–17. To be sure, as Defendants note, the court's finding of noncompliance was based on the narrower definition of "specialized services." That approach, however, was simply a matter of convenience to the court, for Defendants' own data demonstrated that, as of June 30, 2000, they were in substantial noncompliance with their obligations to provide specialized services as they themselves defined it. *See id.* at 121. Thus, little more was needed for the court to find noncompliance with paragraphs fifteen and sixteen of the settlement agreement. Even

so, the court opined that, had the active treatment standard been applied, Defendants' noncompliance was likely more serious. *See id.* at 115–17.

In any event, at the time it ruled on Plaintiffs' original motion for further relief, the court thought it appropriate, if not necessary, to provide guidance to the parties as to how future compliance would be measured. The court concluded that Plaintiffs did indeed have the right to "active treatment." *See id.* at 117. In so ruling, the court rejected Defendants' argument, repeated here, that active treatment means something different for persons with mental retardation or developmental disabilities in nursing facilities than it does for such persons in all other settings. *See id.* The court also rejected Defendants' further argument, pursued here again, that specialized services "analogous to active treatment" is the appropriate standard to apply to eligible individuals in nursing facilities. *See id.* at 116–17.[6]

Given this guidance, Defendants' continuing resistance to the "active treatment" standard concerns the court. For one thing, Defendants must concede that DMR's agent, MetroWest, incorporated the active treatment standard into its measuring instrument for over a decade. (See Docket No. 314, Plaintiffs' Proposed Findings of Fact ("Pls.' Facts"), ¶¶ 19 and 20.) MetroWest completed the PASARR forms during the period of time relevant here, i.e., through August 31, 2001, recorded the specialized services deemed needed for each individual and thereafter assessed whether such services were being provided. (See Docket No. 315, Defendants' Proposed Findings of Fact ("Defs.' Facts"), ¶¶ 180, 181.) Whether or not this

---

**6.** As the court noted, the sole reference to "analogous" services is limited to a data-gathering process, *see* 42 C.F.R. § 483.136(a), which in no way alters the definition of active treatment. *See Rolland,* 138 F.Supp.2d at 116.

amounts to an admission on Defendants' part, it is certainly evidence that "active treatment" can not only be discerned but implemented.

Moreover, the evidence reveals that MetroWest did not employ the active treatment standard in a vacuum. When training its staff, DMR itself used a document which incorporated the federal criteria for active treatment. (See Plaintiffs' Exhibit ("Pls.' Ex.") 40. See also Docket No. 311, November 6, 2001 Transcript ("Tr.Vol.II"), at 121–22.) In addition, DMR, the Department of Medical Assistance ("DMA") and the Department of Public Health ("DPH") created a joint training program which mirrored active treatment criteria. (Pls.' Ex. 44 at 3.) Similarly, DMA's day habilitation regulations mandated that services provided at nursing facilities, as well as other settings, comply with the active treatment standard. (See id.) Furthermore, the independent expert chosen by the parties left no doubt that she employed an active treatment standard. (See Tr. Vol. II at 201–02.) She also testified that the active treatment standard is appropriate for, and commonly used at, nursing facilities which have residents with mental retardation or developmental disabilities. (Id. at 203.)

Although Defendants disparage the active treatment standard as ambiguous, they themselves claim to meet the requirements of "active treatment" in addition to the requirements of "specialized services," the term their counsel preferred to use. (See Docket No. 310, November 8, 2001 Transcript ("Tr.Vol.IV"), at 129; Docket No. 309, November 5, 2001 Transcript ("Tr.Vol.I"), at 69–70.) Granted, Defendants condition their claim on "any kind of reasonable definition" of the term "active treatment." (Tr.Vol. I at 69–70. See also Tr.Vol. IV at 129.) However, nowhere do Defendants provide a more reasonable definition than that utilized by the court—a "continuous, aggressive program that is designed to enable a client with optimal independence and to guard against the loss of that ability." *Rolland,* 138 F.Supp.2d at 116 (citing 42 C.F.R. § 483.440(a)(1)). At best, Defendants suggest that only qualified professionals can define such terms as "continuous" and "aggressive" and thereby give meaning to "active treatment." (Tr. Vol. IV at 130.) At worst, Defendants fear that the court might adopt "some extreme version of active treatment" without factoring in "accepted professional standards." (Id.)

Defendants' assertions to the contrary, the regulatory definition of active treatment, on which the court has relied, is anything but extreme. Moreover, in measuring Defendants' compliance with that standard, the court has had the opportunity, in accord with Defendants' suggestion, to consider the professional testimony offered by both sides. In particular, the court has considered the testimony of Dr. Theodore Kastner, one of Defendants' experts, who appears to have best articulated their position. Dr. Kastner has worked exclusively in the field of health care with regard to persons with mental retardation and developmental disabilities, has managed related hospital programs, and has served as a consultant to the Department of Justice, the President's Committee on Retardation and the Surgeon General. (See Docket No. 308, November 7, 2001 Transcript ("Tr.Vol.III"), at 107.) Dr. Kastner testified that "[a]ctive treatment is a slippery concept to evaluate in the context of a nursing home community" and suggested that the better standard was services "analogous to active treatment." (Id. at 127–28.) "To require active treatment to be provided in the nursing home," Dr. Kastner opined, "means that a nursing home is no longer a nursing home. The nursing home then becomes an [intermedi-

ate care facility ('ICF/MR') ]," which, he noted, has to provide active treatment. (*Id.*)

Despite his criticism, Dr. Kastner utilized the active treatment definition identified in PASARR forms in his own written report, never once using the word "analogous." (See *id.* at 150, 153.) This PASARR definition, in the court's estimation, is indistinguishable from the federal regulatory standard. Although the court seriously doubts whether the individual cases analyzed by Dr. Kastner actually reflect the active treatment he found (see *id.* at 155 (noting that "[a]ll of the identified patients are in receipt of *active treatment* to the degree that they consent for [sic] treatment")), the important point for purposes here is his ready use of the standard (see Pls.' Facts ¶ 24).

To be sure, Dr. Kastner attempted to modify that standard during his testimony by using the word "analogous." He acknowledged, however, that he has never seen an instrument which uses such a modified standard, (see Vol. III at 178; Pls.' Facts ¶¶ 30, 73), nor have Defendants offered one. "The only instrument I have seen that is used to assess whether active treatment is present or not," Dr. Kastner conceded, "is defined" in relation to standards employed by "HCFA," the Health Care Financing Administration. (*Id.*) As it turns out, these are the same regulatory standards which the court cited when concluding that "active treatment" was not only applicable, but enforceable as well. *See* 42 C.F.R. § 483.440(a)(1).[7]

In contrast to Dr. Kastner, Lynn Rucker, one of Plaintiffs' experts, explained the relative ease with which active treatment could be measured for nursing home residents. Ms. Rucker directed case management services for a sixteen-county program in Nebraska for fifteen years and thereafter was state director of developmental disabilities services in Arizona. (Tr.Vol. 1 at 166–67.) She is presently a consultant on health care for people with disabilities. (*Id.* at 168.) Citing 42 C.F.R. § 443.440(a)(1), Ms. Rucker described in detail the ways in which active treatment could be appropriately measured. (Tr.Vol. I at 176–182. See also Pls.' Ex. 4 at 6–9.) As Ms. Rucker testified, "active treatment is active treatment": "The issue isn't location. The issue is, is this active treatment? Is the person receiving it." (Tr. Vol. I at 182.)

In sum, the court is not inclined to apply anything other than an active treatment standard to measure Defendants' compliance, as it indicated it would on March 27, 2001. This is not to say that providing active treatment to class members in nursing facilities is simple. For example, as Defendants point out (see Defs.' Facts ¶¶ 111, 121), nursing facilities have an independent obligation to provide medically-related services to their residents. *See* 42 U.S.C. § 1396r; 42 C.F.R. §§ 483.12, 483.15, 483.25, 483.40, 483.45 and 483.70. These medically-related services ought not be confused with the state's obligation to provide "specialized services." (*See* Defs.' Facts § 115.)

For present purposes, however, Plaintiffs make no claim with respect to the quality of medically related nursing services. (See. Tr.Vol. III at 201–07.) Thus, the court has assumed for purposes here that such services as are provided to class

---

7. Dr. Kastner also noted that it is "extremely important" to observe both the nursing home side and the day habilitation side of the service delivery system "to see what services people are receiving and to be able to con- clude whether they have achieved specialized services or active treatment." (Tr.Vol. III at 168.) This very point was made by the court in its memorandum and order of March 27, 2001. *See Rolland,* 138 F.Supp.2d at 116–17.

members meet applicable regulatory standards. Accordingly, any alleged failure in that respect has not played a part in assessing Defendants' compliance with the settlement agreement and, to the extent that one or more of Plaintiffs' experts may have addressed the adequacy of medical services, the court has disregarded that testimony.

5. *Are there evidentiary "failures" which eviscerate Plaintiffs' position?*

Finally, Defendants attack the strength of Plaintiffs' evidence in three ways. First, Defendants assert that Plaintiffs failed to qualify several of their experts and, accordingly, cannot meet their burden of proving their case. Second, Defendants challenge the statistical validity of Plaintiffs' sampling method. Third, Defendants question the methodology by which Plaintiffs' experts gathered their underlying data.

Defendants' first assertion can be dealt with in short order. As Defendants know, the court denied both sides' motions in limine with respect to the various experts and indicated that it would thereafter consider arguments only as to the weight to be accorded such testimony. (See Docket Nos. 291, 292 and 293. See also Tr.Vol. IV at 147.) That issue has been adequately addressed in the parties' memoranda of law and proposed factual findings.

Defendants' second contention is unsuccessful as well, but requires some explanation. Noting that one of Plaintiffs' experts, Dr. James Conroy, acknowledged a margin of error of fourteen percent with respect to Plaintiffs' sampling methodology, Defendants claim that the actual margin is at least twice that. (See Defs.' Facts ¶ 155.) Moreover, Defendants assert, Plaintiffs' sample size of thirty-nine was simply too small to permit conclusions to be drawn on class-wide service delivery. (See *id.* ¶ 159.)

It is certainly true that, had Plaintiffs had the resources, Dr. Conroy would have recommended a larger sample. (See Tr. Vol. I at 158–59). That would have been preferable to the court as well. But, as Dr. Conroy testified, a larger sample is most important when one is "looking for the prevalence of something rare." (*Id.* at 150.) Dr. Conroy continued:

> If you're looking for a common event for a dominant or prevalent pattern in something, small samples work very well. If you find a big dominant pattern, then the small sample is going to be fine. If you find something very rare and only a couple instances out of 39, then you might have to find a bigger sample.

(*Id.* at 150–51.) As will be shown, Plaintiffs' experts in the case at bar found dominant patterns. Accordingly, the court is satisfied that the margin of error is acceptable for purposes here.[8]

Third, Defendants assert that Plaintiffs' experts were highly, and therefore improperly, individualistic in performing their reviews. For example, as Dr. Walsh testified, it was not always clear how Plaintiffs' experts translated their observations into subjective judgments about service delivery. (See Tr.Vol. II at 270.) Moreover,

---

**8.** Interestingly enough, Defendants' experts also claim to have found dominant, albeit contradictory, patterns, even though their sampling technique was admittedly at risk. (See, e.g., Tr.Vol. II at 267.) Defendants restricted their initial sample pool to the thirty individuals reviewed by Plaintiffs' experts in the summer of 2000, ended with only eight members from that pool and handpicked an additional eight classmembers from those same nursing facilities. (See *id.* at 237–38; Docket No. 281, Defendants' Exhibit ("Defs.' Ex.") 1–A at 8; Tr.Vol. III at 43; Tr.Vol. II at 237–38; Defs.' Facts ¶ 26.)

Dr. Walsh suggested, the court should treat with scepticism any conclusion that *no* individuals were receiving specialized services. (See *id.* at 270–72.)

Defendants' third argument has merit. Unfortunately, Defendants' criticism can as easily be directed at the methodology used and subjective conclusions drawn by their own experts. For example, Dr. Walsh opted to rely on inferences drawn from Dr. Conroy's methodologies in 1999 and 2000, not Dr. Conroy's explanation of his 2001 sampling. (See Defs.' Ex. 1–A at 32.) In addition, although Defendants' review was designed to test the methodology used by Plaintiffs' experts, their critique was limited principally to Plaintiffs' year 2000, not 2001 findings. (See Tr.Vol. III at 12–13.) [9] Defendants' experts also intentionally eliminated from their review all class members residing in the western part of Massachusetts, as well as all nursing homes in which there was only one class member. (See Tr.Vol. II at 308, 311–12; Tr.Vol. III at 48, 50.) Finally, and perhaps more problematically, Defendants' experts were willing to opine, in direct contradiction of Plaintiffs' experts, that *all* class members were in receipt of active treatment. The court, therefore, must be as skeptical of Defendants' conclusion as they urge it be of Plaintiffs'.

At bottom, however, Defendants' final attack misses the mark. While inadequacies on both sides have proven problematical, the court believes that enough information was gathered and presented to measure Defendants' ongoing compliance. As Dr. Walsh himself indicated, "the issue of what . . . people are getting for services

is fairly discernible to professionals," (Tr. Vol. II at 286), and the court has had the benefit of professional testimony adequate to make its findings.

## B. *THE MERITS OF PLAINTIFFS' MOTION*

■ Having addressed Defendants' preliminary challenges, the court turns to the core issue: whether Defendants are in compliance with their obligations to provide specialized services. For the reasons which follow, the court concludes that, as of August 31, 2001, the measuring date chosen by the parties, Defendants remain in substantial noncompliance with the specialized services portion of the settlement agreement and that further relief is necessary. In reaching this conclusion, the court makes the following findings of fact and conclusions of law.

### 1. *Specific Findings of Fact*[10]

When an individual is recommended for specialized services through the PASARR process, he or she is assessed in relation to identified specialized service need areas, in some cases participating in services on a trial basis. (Defs.' Facts ¶ 1.) The resulting assessment is then used in an individualized planning process. (*Id.* ¶ 2.) Generally, an individual's service plan describes the objectives established to address the assessed need areas. It also describes the activities (including intensity, frequency and duration) to be implemented that will assist the individual in attaining the goals within a particular time line. (*Id.* ¶ 3.) DMR is supposed to assess and monitor progress; rapid progress, or absence

---

9. Dr. Walsh's criticism of two of Plaintiffs' experts in particular was based on their outdated September and November affidavits. (See Tr.Vol. II at 269–71. See also Defs.' Ex. 1–A at 39–43.) Dr. Kastner, too, did not review three of Plaintiffs' experts' 2001 reports. (See Tr.Vol. IV at 147–48.)

10. Additional factual findings are either interspersed in the court's conclusions of law or have been mentioned in the previous discussion of Defendants' preliminary arguments.

thereof, is to be identified and modifications to the service plan may occur in order to achieve or revise goals. (*Id.* ¶ 4.) An assessment should not only involve the review of available records, but also interviews with the individual's family and nursing facility staff, as well as observation and analysis of the individual's capabilities. (*Id.* ¶ 5.)

The selection of specialized services may be affected by different clinical judgments. (*Id.* ¶ 6.) Moreover, there may be individuals who refuse one or more services. (*Id.* ¶ 7.) In addition some individual class members may have died, moved from the nursing facility, or simply experienced a medical event such that services are no longer appropriate. (*Id.* ¶ 8.)

There are four primary models which are used to deliver specialized services to class members: day habilitation, in-facility day habilitation, individual support and pediatric model services. (*Id.* ¶¶ 9, 12, 14 and 15.) "Day habilitation" offers services in one setting outside the nursing home. (*Id.* ¶ 9.) It is a Medicaid state-plan service that is governed by federal and state regulations and is available to Medicaid eligible individuals who are determined to have a need for this service. (*Id.*) As of 2001, there were day habilitation programs located throughout Massachusetts servicing over four thousand total individuals: ninety-one day habilitation programs have the capacity to serve up to seventy-five individuals each, five serve between seventy-five and one hundred individuals and four serve between one hundred and one hundred and fifty individuals. (*Id.* ¶ 10.)

"In-facility day habilitation" was developed by DMR and DMA to deliver services at nursing facilities to individuals with complex medical presentations, those choosing not to leave their nursing facility to obtain specialized services, or where community day habilitation is not available. (*Id.* ¶ 12.) Of the class members identified to need specialized services, approximately eighty-five percent receive them primarily through the day habilitation models, half of whom receive specialized services primarily through the in-facility model. (*Id.* ¶¶ 12, 13.) A small percentage receive services in both settings either because of personal preference or because they are undergoing a transition from in-facility to community day habilitation. (*Id.* ¶ 13.)

The "individual support" model of service delivery addresses a discreet number of individuals. Thus, an individual may have a need which is not a covered service in a day habilitation program but which can be met through the provision of a staff person at the nursing facility or another location. (*Id.* ¶ 14.) In the case of individuals with developmental disabilities, there may be a particular provider with extensive experience in treating a particular set of physical limitations (such as those associated with traumatic brain injury) that is retained under contract to provide individual treatment. (*Id.*) Of class members identified to receive specialized services, approximately ten percent are receiving services primarily through this model. (*Id.*)

Finally, DMR and DMA created a "pediatric model" for delivering services to meet the specialized service needs of class members residing in Massachusetts' four pediatric nursing facility units. (*Id.* ¶ 15.) These class members, admitted prior to age eighteen, have complex medical needs and were provided special educational services until they lost eligibility upon turning twenty-two years of age, although they remained in the pediatric nursing facility. (*Id.*) Of the one hundred and fifteen residents of pediatric facilities identified to receive specialized services, eighty-eight (or seventy-seven percent of the total) re-

ceive them through the pediatric model. (*Id.* ¶ 16.)[11]

For two hundred and thirty-eight class members who are developmentally disabled but not mentally retarded, their specialized service needs while they reside in nursing facilities are provided through services arranged through a University of Massachusetts project team. (*Id.* ¶ 18.) The needs of this group often can be provided through one of the models described above. (*Id.*) At other times, for example, individuals suffering from brain injury, these models are not appropriate to the needs of the individual and arrangements must be made with providers with appropriate expertise. (*Id.*)

As required by the settlement agreement, DMR must regularly report upon the status of specialized service delivery. (*Id.* ¶ 19.) These reports describe the services to be arranged to meet specialized service needs, as well as various types of situations and circumstances that may affect their delivery. (*Id.*) DMR training materials for the provision of specialized services incorporate the components of active treatment: development of specific goals by an interdisciplinary team, individualized objectives and strategies, staff training, carry-over and documentation. (Tr.Vol. II at 121–22, 126–28; Pls.' Exs. 40, 44.) These are the same standards used at an ICF/MR facility. (Tr.Vol. II at 122.)

### 2. *Conclusions of Law*

For convenience sake, the court divides its five legal conclusions as follows: (a) only a few class members are receiving specialized services; (b) specialized services are not being provided in a timely manner; (c) Plaintiffs' experts independently confirm Defendants' noncompliance; (d) over three hundred class members may

have been erroneously rejected for specialized services; and (e) there are problems with the dichotomy between nursing homes and day habilitation programs.

### a. *Only a few class members are receiving specialized services.*

The evidence is clear that only a few class members are receiving specialized services individually tailored to address their needs. (See Pls.' Exs. 4 at 90–95, 5 at 39–43, 8 at 50–54, and 11 at 38–42.) DMR's own checklists of day habilitation participants reveal that significant numbers of class members do not have habilitation plans that address all identified areas of specialized services. (See Tr.Vol. II at 128–29; Pls.' Ex. 48 at 2.) Among other things, DMR's draft report in July of 2001 indicates that thirteen percent of those receiving on-site or off-site services were not receiving all the services identified as needed. (Tr.Vol. II at 128–30; Pls.' Ex. 48.)

To be sure, Defendants try to explain away this data as neither comprehensive nor individualized. (Defs.' Facts ¶ 96.) Even assuming the draft nature of the report, however, DMR checklists derived from MetroWest data reveal a lack of adequate day habilitation plans and a failure to implement these plans for many class members. (Pls.' Ex. 48 at 1–3; Pls.' Facts ¶ 57.) Moreover, Defendants have never offered a final version of the document.

Similarly, DMR's semi-annual report of August 17, 2001, reveals that nearly six hundred class members—more than seventy-five percent of the class with identified specialized service needs—had at least one finding of a "needed but not provided" service. (Pls.' Facts ¶ 53; Pls.' Ex. 76.) To be sure, as Defendants' experts noted,

---

**11.** Approximately five percent of the total active specialized services population receives

specialized services through other service delivery models combined. (*Id.* ¶ 17.)

MetroWest's review process could result in errors.[12] These inadequacies, however, do not explain the majority of cases found by MetroWest where services were not being provided in accord with stated objectives. Even taking into account those individuals who referred services, the number of individuals not receiving all the services deemed necessary for them was still exceptionally high.

MetroWest's review process—to determine whether specialized services that had been identified as needed were in fact received—was conducted by qualified mental retardation professionals. (Tr.Vol. I at 107–09.) Evaluators would make an appointment with a particular individual, or the nursing home if the individual was not able, and then spend an hour or two reviewing the clinical record, conducting interviews and making their own observations. (*Id.* at 108.) Evaluators were also required to follow specific criteria and to record their views on appropriate PA-SARR forms. (*Id.* at 110–11.)[13]

Granted, MetroWest evaluators did not visit day habilitation programs, that not being part of their contract and DMR having specifically requested that they not do so. (See *id.* at 112.) However, the evaluators would either review such day habilitation records as were included in nursing facility records or request those records from DMR service coordinators or University of Massachusetts case managers. (*Id.* at 112–13.) "[O]ne way or another," Ellen Zarek testified, "we generally get the opportunity [to review the day habilitation records] before we make a decision." (*Id.* at 113.) In light of this evidence, it is impossible to accept Defendants' contrary claim that "all" class members—excluding those who had died, moved or no longer needed services, or those whose services were in the process of being arranged—"were receiving all the specialized service[s] recommended for them [and to] which they consented." (Defs.' Facts ¶ 20.)

b. *Specialized services are not being timely provided.*

Even if the data provided by MetroWest was inaccurate at times, as claimed by Christine Oliveira, DMR's PASARR Director, (Tr.Vol. II at 150), there was sufficient independent testimony to confirm that specialized services were not being provided in a timely manner. Ms. Oliveira herself acknowledged that an individual identified as "DS," who needed day habilitation, had not received those services in a timely manner. (*Id.* at 112–15.) Similarly, the report for "Ms. M" indicated that the services she needed as of June 30, 2001, would not be provided until February 15, 2002, over seven months later. (*Id.*

12. For example, as conceded by Ellyn Zarek, MetroWest's director of state-wide assessments since July of 1989, the absence of documentation could often result in a finding that services were needed, but not provided. (See Tr.Vol. I at 119.) Similarly, an individual's need to obtain services sequentially could result in a finding that certain services were not being provided and an individual who refused services would be shown as not receiving them. (See *id.* at 124, 127. See also Tr.Vol. III at 23–24 (testimony regarding individual who was not receiving services because his guardian did not consent) Tr.Vol. IV at 24–25 (similar).)

13. It is also noted that MetroWest used an active treatment standard which DMR had agreed to in 1993. (Id. at 115–16; Pls.' Ex. 29.) As Ms. Zarek testified, "it seemed the fair thing to do to give [individuals] credit for receiving specialized services when they're going to a full-time program that is supposed to be providing active treatment." (Tr.Vol. I at 116.) Unfortunately, Ms. Zarek concluded in May of 2001 that "few day habilitation programs or nursing facilities seem to understand specialized services or how to write objectives." (*Id.;* Pls.' Ex. 29.)

at 115.) Likewise, Ms. Oliveira acknowledged that services due by December 21, 2000, to an individual identified as "FB" had not been provided nearly five months later. (*Id.* at 116–17; Pls.' Ex. 42.) Ms. Oliveira also acknowledged that a "JB," for whom services were due in 1995, did not have those services as of May, 2001, over five years later. (*Id.* 117–118. See also Pls.' Ex. 42.) As it turns out, Defendants were not even aware of JB's presence in the nursing home until May of 2001. (*Id.* at 152–53.) This meant, Ms. Oliveira testified, that specialized services, "active treatment" aside, were simply not being provided. (*Id.* at 118.) In short, all too often specialized services were not being provided in a timely manner.

### c. *Plaintiffs' experts independently confirm Defendants' noncompliance.*

Even were the court to ignore DMR's own findings, Plaintiffs' expert witnesses provided independent confirmation that, as of August 31, 2001, Defendants were failing to substantially comply with their obligations to provide specialized services to class members. To be sure, Defendants, relying on their own experts' testimony that the PASARR reports were unreliable, (see Defs.' Facts ¶¶ 180–99), assert that Plaintiffs' experts relied too much on PASARR findings. This assertion, in the court's opinion, is not accurate. Although Plaintiffs' experts used PASARR findings as a starting point, they each made individual observations, interviewed staff and family members and utilized multiple sources of information, including nursing home notes, patient files and day habilitation progress notes. (See, e.g., Tr.Vol I at 171–73, 183, 211–12, 217 and 223; Pls.' Ex. 4.) They each found that numerous class members simply were not receiving active treatment.

Ms. Rucker, who reviewed twenty-one cases, found no instance in which active treatment was being provided. For example, she described "JM," a thirty-four year old woman, as receiving some services, but not active treatment. The day program was trying to increase JM's awareness of nutritional values, Ms. Rucker testified, but the nursing home provided no carry-over services. (Tr.Vol. I at 185–88. See also Pls.' Ex. 4 at 47–52.) The same problem was found with respect to "RM," a forty-four year old man for whom there was no apparent continuity between the day habilitation program and the nursing home. (See Tr.Vol. I at 188–90; Pls.' Ex. 4 at 59–63. Compare Tr.Vol. IV at 30–31 (testimony of Defendants' expert, Karen Williams, that RM is only able to tolerate a few hours of support).)

Barbara Pilarcik, another of Plaintiffs' experts, is a registered nurse who had previously worked for DMR as an appeals mediator and had managed intermediate care facilities for the Association for Community Living ("ACL"). (Tr.Vol. I at 214.) She presently directs ACL's specialized home care program for one hundred and thirty individuals with developmental disabilities and mental retardation. (*Id.* at 215.) In preparation for her testimony, Ms. Pilarcik reviewed thirteen individuals, eleven of whom she had reviewed at an earlier stage of this litigation. (*Id.* at 217.) She too found that active treatment was not being provided.[14] Although there were

---

14. For example, with respect to "WD," a forty-four year old developmentally disabled woman, the nursing home was not able to follow through on day habilitation activities. (*Id.* at 224–25. Compare Tr.Vol. IV at 27–28.) Similarly, "SB," a sixty-seven year old mentally retarded man who suffered from gastroesophageal reflux disease, failed to have implemented at his nursing home the swallowing and communication programs developed for him at the Stone Educational Collaborative Program (Tr.Vol. I at 225–28); a

exceptions (see Tr.Vol. II at 11–12), Ms. Pilarcik attributed such problems to a consistent lack of trained staff at nursing homes qualified in serving people with mental retardation and developmental disabilities (see Tr.Vol. I at 229–30).

Another of Plaintiffs' experts, Elizabeth Jones, testified similarly. Ms. Jones has twenty-eight years of experience in the field of mental retardation and developmental disabilities. (Tr.Vol. II At 19.) She was the director of staff development at the Belchertown State School from 1977 until 1982, during which time she was responsible for ensuring compliance with court orders. (*Id.* at 19–20.) For one year thereafter she was the acting superintendent responsible for insuring that active treatment was provided to residents. (*Id.* at 20.) Thereafter she was district manager for western Massachusetts.

With respect to the case at bar, Ms. Jones reviewed eleven class members, eight of whom she had visited during an earlier stage of the litigation, often following the particular client to the day habilitation program. (*Id.* at 22–23.) She, too, concluded that clients were not receiving active treatment. (*Id.* at 29.) With the exception of two instances, she found that the frequency and intensity of services were weak. (See *id.* at 30.) "JL," for example, spends all her time stringing plastic beads, while "GM" was engaged in a Sisyphean cycle of filling clay flower pots with soil, only to have them quickly emptied by staff. (*Id.* at 30–31.) Ms. Jones also found a lack of carryover between day habilitation programs and nursing homes, calling it "one of the most serious prob-

lems underlying this entire set of circumstances." (*Id.* at 32.) She continued:

> And I saw it in virtually every case, even—even where I thought this might not be a problem. Certainly in nursing homes where the day programs are located in the nursing home where I thought for sure staff would be talking to each other, in fact, there was no evidence of carry-over between day program staff and nursing home staff.

(*Id.*)

To be sure, Defendants point to some "success stories." For example, Frederick Huntington, DMR's area director for Berkshire County, testified about "EA," a forty-nine year old woman who has lived in a nursing home for thirty-one years. Mr. Huntington averred that, Plaintiffs' expert's views to the contrary, EA has had work opportunities, e.g., volunteering at Berkshire Community College. (Tr.Vol IV at 13. *See also* Defs.' Facts ¶¶ 78–81.) Nonetheless, Mr. Huntington was unable to counter the crux of Ms. Jones' testimony, namely, that EA was not able to utilize an electric wheelchair at her nursing home, although she thrived with such use at the day habilitation center. (*Id.* at 14.) Mr. Huntington also acknowledged that nursing staff was actively discouraging EA from leaving the nursing facility. (*Id.* at 18.)

It may well be, as Defendants argue, that Plaintiffs' experts have set a high bar for measuring Defendants' compliance. (See Tr.Vol. II at 270–73.) But, in the court's opinion, Defendants' ability to question certain aspects of Plaintiffs' experts' testimony does not undermine their

---

nursing home aide was simply unaware of the swallowing program (*id.* at 228–29). (Compare Tr.Vol. IV at 32–33 (testimony of Karen Williams that nursing staff had been trained in a feeding protocol).) Ms. Pilarcik also testified with respect to "BG," a seventy year old

woman with Down's syndrome (who repeatedly showed up at day habilitation with feces under her fingernails), that staff members at the nursing home were completely unaware of her needs. (See Tr.Vol. I at 230–33.)

basic findings, namely, that all too often class members are simply not receiving the active treatment to which they are entitled.

This should come as no surprise to Defendants. As described, they have resisted the very notion that active treatment applies to Plaintiffs' class. Indeed, despite the fact that the active treatment standard had been used historically by Defendants, their experts disregarded that standard when analyzing Plaintiffs' experts' reports. They saw "no worth in evaluating active treatment using HCFA standards," having concluded that such standards "are not applied to nursing homes." (Tr.Vol. III at 97.) Rather, they looked only "at specialized services." (*Id.*)[15]

> d. *Over three hundred class members may have been erroneously rejected for services.*

Yet another troubling shortcoming of Defendants' provision of specialized services is the real possibility that, during the time period in question, more than three hundred additional individuals failed to receive treatment because they had been erroneously rejected for *all* specialized services. Evidence of this comes from the independent expert called for in paragraph nine of the settlement agreement, Karen McGowan.

Ms. McGowan was required by the agreement to review the negative determinations of class members' needs for specialized services when the rate of such determinations fell below seventy-five percent of individuals reviewed in a particular quarter. (See Tr.Vol. II at 197; Pls.' Ex. 61 at 2; Pls.' Facts ¶ 109.) She conducted her initial reviews for the first and second

quarters of 2000 on October 2 through 10, 2000, and submitted a report on January 27, 2001. (Pls.' Ex. 61 at 1; Pls.' Facts ¶ 110.) She reviewed a fifteen percent sample of the total number of individuals determined not to be appropriate for specialized services by MetroWest. (Tr.Vol. II at 200; Pls.' Ex. 6 at 3; Pls.' Facts ¶ 112.) For the first quarter of 2000, she determined that nine of the nineteen individuals sampled were in need of specialized services, representing more than a forty-seven percent disagreement rate with the PASARR evaluations. (Pls.' Ex. 61 at 11; Pls.' Facts ¶ 113.)

Ms. McGowan also submitted reports for the third and fourth quarters of 2000 and the first and second quarters of 2001. (Pls.' Exs. 62–64; Pls.' Facts ¶ 117.) These subsequent reports used a similar sampling procedure and resulted in disagreement rates with the PASARR evaluations ranging from forty-three to seventy-six percent. (Pls.' Exs. 62–64; Pls.' Facts ¶ 118.)

At bottom, Ms. McGowan's reports indicate a unacceptably high rate of error in the so-called "negative recommendations" for specialized services by MetroWest. She testified that more than three hundred class members had likely been without specialized services to which they were entitled. (See Tr.Vol. II at 206; Pls.' Facts ¶ 122.)

The parties treat Ms. McGowan's findings in significantly different ways. Plaintiffs assert that, prior to August 31, 2001, DMR, at a minimum, had not begun to provide specialized services for any of the forty-four class members determined by Ms. McGowan to have been erroneously

---

**15.** The court notes that while Dr. Walsh, one of Defendants' experts, initially designed an instrument to measure Plaintiffs' experts' reports through use of an active treatment standard (see Tr. Vol. II at 250–52, 281–83), the standard was not included in his final guidelines (see *id.;* Pls.' Exs. 71 and 72).

denied services during the first and second quarters of 2000. (Pls.' Facts ¶ 123; Pls.' Ex. 41.) Moreover, Plaintiffs contend, DMR has not established a systematic process to review erroneous determinations concerning the need for specialized services and could not identify one class member as of August 31, 2001, who had been provided specialized services where there had been an erroneous negative determination of the need for such services. (Pls.' Facts ¶¶ 119, 120.)

Defendants, on the other hand, see Ms. McGowan's reports as confirming DMR's previous decision to assume from MetroWest the responsibility for the PASARR screening process. (Defs.' Facts ¶ 144.) Moreover, they consulted with Ms. McGowan as they undertook the task of redesigning the PASARR screening tool. (*Id.* ¶ 145.) In addition, Defendants decided as of August 31, 2001, to provide services to the particular individuals found by Ms. McGowan to have been erroneously determined not to need such services. (*Id.* ¶ 147.)

There is little doubt that Plaintiffs welcome the effort undertaken by Defendants to provide service to those individuals, belated though that effort may be. Still, for purposes here, the information provided by Ms. McGowan demonstrates that many class members went without specialized services prior to August 31, 2001.

e. *There are problems with the dichotomy between nursing homes and day habilitation centers.*

Another fundamental flaw in Defendants' approach to the delivery of specialized services is their evident willingness to date to permit class members to exist in parallel universes, nursing homes and day habilitation centers, with neither world adequately communicating with the other. Indeed, Defendants' experts' own report concludes by noting the very different missions of nursing homes and day habilitation programs. (See Defs.' Ex. 1–A at 81–82. See also Tr.Vol. II at 59–60.) Unfortunately, as Ms. Jones testified, nursing homes focus on "basic management of health needs, like the taking of temperatures [and the administration of] medications" and do not themselves "have a very strong focus at all on issues like learning or development." (Tr.Vol. II at 59.)

The court believes, at least with respect to provision of specialized services, that the mission of nursing homes and day habilitation centers needs to be the same, i.e., to provide active treatment so that individual class members have the opportunity, as Ms. Jones described, "to grow and develop and learn and enjoy life to the greatest degree possible." (*Id.* at 41.) Without that, opportunities will be missed and resources wasted. This is particularly true since class members in nursing homes often have "more skills and in some ways [are] less disabled than the people [Ms. Jones saw] at Belchertown and who are now in community based programs." (*Id.* at 58.)

Defendants appear to agree that this lack of coordination between service providers can no longer be tolerated. John Riley, DMR's Deputy Assistant of Operations, testified about recent efforts by DMR and DMA to improve such coordination, including communicating the content of day habilitation individual service plans to nursing facility staff and facilitating joint meetings between service providers and nursing facilities. (See Defs.' Facts ¶ 126.) In addition, Defendants point to a letter dated December 20, 2000, to administrators of long term care facilities which indicates that DPH would be "increas[ing] its scrutiny of services provision to residents in nursing facilities who have mental

retardation or developmental disability." (Defs.' Ex. 8; Pls.' Ex. 53.) Defendants also cite a September 21, 2001 letter reminding long term care facilities of their obligation to complement and reinforce specialized services chosen through the PASARR process. (Pls.' Ex. 54.) This letter suggests several "initial steps" that long term care facilities "should take" to meet these requirements, including "inviting the DMR Service Coordinator/[University of Massachusetts] Case Manager to the annual MDS/Care Planning Meeting for each MR/DS resident; ensuring that the Specialized Service Plan is available to LTCF staff for the purpose of ongoing resident care planning; and ensuring that care plan interventions complement, reinforce and are consistent with the Specialized Services Plan." (*Id.* at 2.)

Other than coming too late, Defendants' missives merely suggest, but do not require, the incorporation of specific goals, objectives and strategies into nursing home plans. (See also Tr.Vol. IV at 116.) There is no requirement that day habilitation, whether within or outside the facility, and nursing facilities develop and abide by a single plan. (*Id.* See also Tr.Vol. III at 228 (testimony of Kelly Lawless, DMA's special compliance coordinator).) Indeed, Defendants' draft day habilitation review checklist reveals that, as of August 19, 2001, nearly twenty percent of the 566 day habilitation program participants had no plan at all or an inadequate plan for specialized services. (Pls.' Facts ¶ 180; Pls.' Ex. 48.) More importantly for purposes here, DPH surveys at nursing home facilities found some class members with no individual service plan on file, others whose plans did not incorporate goals and strategies from the day habilitation plan, and yet others whose services were so poorly documented that it is unclear what services were provided and when. (Pls.' Facts ¶ 181.)

At bottom, the evidence confirms the unfortunate parallel tracks which Defendants appear intent on pursuing. While greater coordination in the general sense is no doubt helpful, a significantly more formal coordination is needed to ensure Defendants' compliance with their obligations to provide specialized services to class members. Nursing homes should not become new backwards in terms of the delivery of such services.

C. RELIEF

Plaintiffs propose a number of steps which they believe will provide a meaningful remedy for Defendants' noncompliance with respect to the provision of specialized services. For their part, Defendants argue that, there being no violation, no remedy is appropriate. Alternatively, Defendants argue that, should the court find a lack of substantial compliance, court-ordered relief should be limited, that is, the court ought not become the "superintendent" of DMR with respect to the delivery of specialized services, as they argue many of Plaintiffs' suggestions would entail. As will be evident, the relief ordered by the court falls somewhere between the parties' positions.

1. *Overview*

On March 27, 2001, the court found Defendants in noncompliance as of June 30, 2000, with their obligations under paragraphs fifteen and sixteen of the settlement agreement. *Rolland*, 138 F.Supp.2d at 121. Despite efforts on Defendants' part, this noncompliance has continued, as described, in large part because they have been willing to have the class members' services governed by a divided administrative regime, enhanced by their resistance to an active treatment standard. Granted, it is DPH, not DMR, which has certain

oversight responsibilities for nursing homes. But the defendant agencies cannot act in isolation, as Defendants themselves would concede. Neither can they simply communicate at times, as if such communication is sufficient to ensure that class members receive their services in a manner required not only by law, but by the settlement agreement itself.

Accordingly, certain relief proposed by Plaintiffs is more than appropriate in accord with the court's power under paragraph thirty-two of the settlement agreement. As District Judge Keeton recently observed: "It is well established by tradition and practice in the American Legal System that a court may make orders in aid of enforcement of its Judgment." *Atlantic Research Marketing Systems, Inc. v. G.G. & G., L.L.C.*, 167 F.Supp.2d 458, 475 (D.Mass.2001). *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 380, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) ("[S]ound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen.") (citation omitted).

However, given the particulars of Defendants' noncompliance to date, some of Plaintiffs' suggestions are simply too broad and intrusive. For example, the court finds inappropriate Plaintiffs' suggestion that the court should increase the number of individuals placed yearly in community settings. The parties' settlement agreement, as the court understands it, was carefully negotiated with respect to community placement and, for the moment,

the court will not use Defendants' failure to comply with their specialized services obligations to expand their community placement obligations.

Similarly, the court will not order Defendants to pay for an independent expert to review all individuals who had been determined not to require specialized services. The role of Ms. McGowan, the present independent expert, with respect to such determinations is set forth in a part of the settlement agreement not directly in issue (paragraph nine), and, at most, Defendants are required only to consider that expert's recommendations in good faith. (See Settlement Agreement ¶ 10.) To be sure, the court has considered the independent expert's findings pursuant to paragraph nine as further proof that many class members went without specialized services prior to August 31, 2001. But the court does not believe that a remediation is mandated with respect to paragraph nine, particularly in light of Defendants' representations that, without further assessments, services would be provided to those individuals who the independent expert determined to be in need. (See Defs.' Facts ¶¶ 147–48.)

Likewise, the court is not going to appoint a special master to oversee Defendants' implementation of specialized services. The settlement agreement is comprehensive enough at this time to ensure, and Plaintiffs' attorneys skilled enough to monitor, Defendants' ongoing compliance.[16]

### 2. *Relief Summary*

██ "[I]njunctive relief should be no more burdensome to the [enjoined party]

---

16. The court is also not yet convinced of the necessity of still other remedies offered by Plaintiffs, e.g., requiring sufficient numbers of trained professionals be placed in nursing facilities, mandating the provision of specialized services in settings other than nursing facilities, barring the admission of class members into nursing facilities in favor of intermediate care facilities, shortening the agreed upon time limit for the provision of specialized services, or barring the admission of class members into nursing facilities deemed unable to provide all recommended services.

than necessary to provide complete relief to the [parties complaining of violation of their right]." *Atlantic Research Marketing,* 167 F.Supp.2d at 475–76 (quoting *Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). Thus, although the court is obviously reluctant to redesign the entire structure of service delivery, there are five specific changes which must be made in order to remedy Defendants' noncompliance. Defendants shall promptly seek and consider Plaintiffs' views with respect to designing and implementing each of the changes.

First, the fragmented assessment of class members' needs can no longer be tolerated. Each class member must have a coherent, integrated treatment plan which guides his or her services across all settings. Accordingly:

1. Within sixty days Defendants shall establish and implement a system for (a) a DMR coordinator and one individual service plan for each class member with mental retardation, and (b) a case manager and an interdisciplinary treatment plan for each class member with other developmental disabilities.

Second, as described, the court has interpreted both federal law and the Settlement Agreement as requiring active treatment. Given Defendants' resistance, it is necessary to spell out their obligations in greater depth and require as follows:

2. Within sixty days, Defendants shall establish and implement a clear policy of "active treatment" to be provided to all class members who need specialized services. *See* 42 C.F.R. §§ 483.120(b) and 483.440(a)(1). Active treatment shall be comprised of the provision of services which are: (a) relevant to meet assessed needs; (b) sufficient in intensity and frequency to promote growth or prevent deterioration; (c) individualized and integrated; and (d) continuous and which

carry over from community programs and settings to nursing facilities. Specialized services determined to be needed pursuant to this policy shall be provided regardless of whether or not they are covered in Massachusetts' Medicaid plan.

Third and fourth, given Defendants' failure to fully implement the active treatment standard, the court will also require the following:

3. Within sixty days, Defendants' reports pursuant to ¶ 24(b) of the settlement agreement shall incorporate measuring devices in compliance with the active treatment standard; and

4. Within one hundred and twenty days, DMR and nursing facilities staff shall be trained in the requirements of the settlement agreement as well as in the policies and structures implemented as a result of this order.

Fifth, the court orders as follows:

5. Defendants shall immediately utilize the services of the independent expert to evaluate the accuracy, validity and reliability of their new PASARR instrument. The evaluation shall be completed no later than sixty days from the date hereof. If the evaluation suggests further changes but such changes are not implemented within forty-five days thereafter, Plaintiff may return to court for further relief.

After all, it was at the recommendation of the independent expert that Defendants decided to amend the instrument so as to address the problems described herein. Finally, the court orders Defendants to certify and file with the court a detailed report regarding compliance with respect to paragraphs one, two, three and five within sixty days and with respect to paragraph four within one hundred and twenty days.

In the court's estimation, the ordered relief falls well within its powers under paragraph thirty-two of the settlement agreement. As importantly, the relief is designed to ensure that Plaintiff class members properly receive specialized services in a manner required by law, while respecting Defendants' responsibilities to design the particular mechanisms by which those ends will be accomplished.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' Amended Motion for Further Relief Concerning Specialized Services is hereby ALLOWED as described.

IT IS SO ORDERED.