Loretta **ROLLAND**, et al., Plaintiffs

v.

Argeo Paul **CELLUCCI,**
et al., Defendants

No. CIV. A. 98–30208–KPN.

United States District Court,
D. Massachusetts.

March 27, 2001.

---

Richard D. Belin, Nima R. Eshghi, Foley, Hoag & Eliot, Boston, MA, Steven J. Schwartz, Cathy E. Costanzo, Northampton, MA, Stacie B. Siebrecht, Matthew Engel, Frank J. Laski, Christine M. Griffin, Boston, MA, for Plaintiffs.

Peter T. Wechsler, Attorney General's Office, Judith S. Yogman, Attorney General's Office, Government Bureau, Boston, MA, H. Gregory Williams, Attorney General's Office, Springfield, MA, Ginny Sinkel, Office of the Attorney General, Government Bureau, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER WITH REGARD TO PLAINTIFFS' MOTION FOR FURTHER RELIEF CONCERNING SPECIALIZED SERVICES (Docket No. 159)

NEIMAN, United States Magistrate Judge.

Presently before the court is Plaintiffs' motion for further relief concerning specialized services. The motion asks the court to do three things: (1) find that Defendants have not been substantially complying with portions of the parties' settlement agreement which governs specialized services, (2) lift the stay imposed by the settlement agreement with respect to specialized services, and (3) order Defendants to take certain remedial actions. When scheduling oral argument, the court indicated that it would hold a nonevidentiary hearing on the first two parts of the motion and reserve the third question for another day. Having heard argument and having considered the parties' submissions, the court, as described below, will allow the motion insofar as it seeks a finding of substantial noncompliance and will lift the stay. Plaintiffs are now free to seek appropriate relief.

## I. BACKGROUND

The court will not describe the factual and procedural background of this matter, it having done so in prior memoranda. *See Rolland v. Cellucci,* 106 F.Supp.2d 128 (D.Mass.2000); *Rolland v. Cellucci,* 191 F.R.D. 3 (D.Mass.2000); *Rolland v. Cellucci,* 52 F.Supp.2d 231 (D.Mass.1999). Suffice it to say for purposes here that on January 10, 2000, the court approved a Settlement Agreement (Docket No. 115) brought by a class of mentally retarded and developmentally disabled individuals against certain government actors. The implementation of certain aspects of the agreement, over which the court has retained jurisdiction, is currently at issue.

By its own terms, the Settlement Agreement, although approved by the court, is "not ... enforceable by contempt or by a breach of contract action in state or federal court." (Settlement Agreement ¶ 27.) Rather, the agreement obligates Plaintiffs to first "notify Defendants of any alleged noncompliance" and to "request a meeting for the purpose of attempting to resolve the problems identified." (*Id.* ¶ 30.) If the meeting fails to resolve the issue, the parties are obligated to engage in at least two days of mediation. (*Id.* ¶ 31.) Only if mediation fails may Plaintiffs "file a motion with the Court seeking a judicial determination that Defendants are not substantially complying with the Agreement." (*Id.* ¶ 32.) The motion cannot be filed until at least thirty days have passed from Plaintiffs' initial notification to Defendants. (See *id.* ¶ 30.) If the court thereafter finds "that Defendants are not substantially complying with the Agreement[,] ... it may lift the stay otherwise imposed under paragraph [twenty-eight] and the Plaintiffs may seek injunctive and other relief based

upon the then existing facts and law." (*Id.* ¶ 32.) [1]

The present issue concerns Defendants' compliance with paragraphs fifteen and sixteen of the Settlement Agreement. Taken together, these two paragraphs obligate Defendants to provide class members specialized services identified through a process known as preadmission screening and annual resident review ("PASARR"). In their entirety, the paragraphs provide as follows:

15. Of the 858 nursing facility residents, according to the PASARR evaluators, who were not receiving all specialized services recommended in their PASARR evaluations as of July 1, 1998, the Defendants shall provide or arrange for those specialized services to all such residents by December 31, 1999.

16. For all other Massachusetts residents who are class members whose PASARRs recommend specialized services, Defendants shall provide or arrange for the provision of those specialized services by April 30, 2000, or within 90 days of the individual's admission to a nursing facility, whichever is later.

(*Id.* ¶¶ 15, 16.)

The seeds of Plaintiffs' motion were planted on February 22, 2000, when Plaintiffs notified Defendants of their alleged noncompliance with paragraph fifteen. Mediation ensued in April. On June 1, 2000, Plaintiffs notified Defendants of their alleged noncompliance with paragraph sixteen. Further mediation took place during June of 2000. Mediation having failed, Plaintiffs now claim more formally with respect to paragraph fifteen that Defendants' own reports demonstrate that, as of December 31, 1999, a significant number of

---

1. The Settlement Agreement's stay provision, paragraph twenty-eight, simply states that "[f]urther proceedings in [this action] will be stayed, subject to the [agreement's enforcement] provisions." (*Id.* ¶ 28.)

class members were not receiving all, and that some class members were not receiving any, of the specialized services they were determined to need. In addition, Plaintiffs assert that as of June 30, 2000, two months after the April 30, 2000 deadline established in paragraph sixteen for specialized services to be rendered all class members, the pattern of noncompliance continued.

## II. *DISCUSSION*

The court will consider two issues with respect to the present motion. First, the court will determine whether Defendants were "not substantially complying with" paragraphs fifteen and sixteen of the Settlement Agreement.[2] If Defendants were not in such compliance, the court will consider whether it should lift the stay otherwise imposed by the agreement and allow Plaintiffs to seek further relief.

## A. *SUBSTANTIALLY COMPLYING*

The principal issue of Defendants' substantial compliance has two subsidiary questions. The court must first determine the date on which substantial compliance must be measured. Second the court must define "substantially complying" vis a vis paragraphs fifteen and sixteen. Only then can the court resolve whether, by the date selected, Defendants were "substantially complying with" those paragraphs.

### 1. *What is the Compliance Date?*

Plaintiffs argue that Defendants' own reports demonstrate noncompliance as of both December 31, 1999, and April 30, 2000—the dates established in paragraphs fifteen and sixteen—and that Defendants were still not in substantial compliance on June 30, 2000, as reflected in Defendants' first semi-annual report dated August 10, 2000. The latest date the court should consider for measuring non-compliance, Plaintiffs assert, is June 30, 2000.

In response, Defendants initially pointed to September 30, 2000, as of which time, they claim, later status reports show substantial compliance. (See Defendant's Opposition to Plaintiffs' Motion Alleging Noncompliance with the Settlement Agreement (Docket No. 172) at 14.)[3] On December 4, 2000, however, at the commencement of oral argument, Defendants filed additional affidavits and asserted that all data prior to October 30, 2000, was stale. In reply, Plaintiffs decry the moving target with which they are faced, although they do not fault Defendants' efforts to improve the delivery of specialized services. For the reasons which follow, the court believes that June 30, 2000, is the appropriate point of measurement.

At first blush it would appear that compliance should be measured from the specific dates set forth in paragraphs fifteen

**2.** To be sure, the Settlement Agreement indicates "that Plaintiffs must demonstrate that Defendants are not substantially complying *with the agreement.*" (*Id.* ¶ 32 (emphasis added).) The parties appear to agree, however, that Plaintiffs are free to address the compliance question piecemeal, as they have done here. Thus, in the instant motion, Plaintiffs assert only that Defendants are not substantially complying with those parts of the Settlement Agreement which govern specialized services. As it turns out, Plaintiffs, by separate motion, also seek a finding of substantial noncompliance with respect to that part of

the Settlement Agreement which governs the diversion of class members from inappropriate admissions to nursing facilities. The court has ruled on that motion in a separate memorandum and order issued this day.

**3.** Defendants' brief, dated October 13, 2000, included data not yet seen by Plaintiffs. Accordingly, at Plaintiffs' request, the court ordered a limited round of discovery. (See, e.g., Plaintiffs' Motion to Compel Discovery (Docket No. 166), margin notation.)

and sixteen, December 31, 1999 and April 30, 2000, by which Defendants were to comply with certain obligations. Even though Defendants now argue that these deadlines were overly ambitious, it must be remembered that the Settlement Agreement was quite specific as to the numbers of class members for whom specialized services were to be provided by Defendants. Of course, were less measurable provisions of the Settlement Agreement at issue, the date of compliance may well be more fluid.

Nonetheless, the court believes that the Settlement Agreement itself, if not fairness alone, calls for some leeway. As indicated, the agreement affords the parties an opportunity to resolve any dispute through notice and mediation. (Settlement Agreement ¶¶ 30, 31.) If an identified problem is resolved through mediation, the court is no less the wiser. If mediation fails, however, the court must presume that the identified issues remain in contention at the moment of such failure and, therefore, must be resolved as of that time.

Here, Plaintiffs' notification of Defendants' alleged noncompliance with paragraphs fifteen and sixteen occurred, respectively, on February 22 and June 1, 2000. After informal meetings failed, the parties, pursuant to paragraph thirty-one of the Settlement Agreement, engaged in mediation for three days in April and June. Thus, a measuring date of June 30, 2000 follows comfortably after the agreement's notification and mediation directives. Choosing an earlier date would undermine the notification and mediation process.[4]

In addition, June 30, 2000, is the most appropriate benchmark given the issues presented. As framed, Plaintiffs' motion repeatedly refers to Defendants' semi-annual report which analyzed specialized services through June 30, 2000, (Plaintiffs' Motion for Further Relief Concerning Specialized Services (Docket No. 159) ¶¶ 8–10), despite the fact that paragraph sixteen established April 30, 2000 as the outside date of compliance. The affidavits filed in support of the motion similarly point to June 30th. (See *id.*, Exhibits 1 (Affidavit of Elizabeth Jones) ¶ 9 (indicating that evaluation occurred "between late June and the end of July"), 2 (Affidavit of Barbara Pilarcik) ¶¶ 5 and 6 (noting that evaluation included reviewing "reports from January and July 2000" and visiting individuals "between late June and mid August"), and 3 (Affidavit of Andrew H. Dubin) ¶ 19 (referring to "[t]he most recent court report, covering the period through June 30, 2000").)

In choosing a date shortly after mediation efforts failed, the court is also mindful of the fact that a finding of substantial noncompliance merely triggers the stay-lifting question. (See Settlement Agreement ¶ 32.) Only if the stay is lifted are Plaintiffs entitled to seek injunctive and other relief. Defendants' arguments to the contrary, it is the relief—not the lifting of the stay—which is based on "then existing facts and law." (*Id.*) Accordingly, if Defendants have since complied with the Settlement Agreement to the satisfaction of Plaintiffs, it is entirely possible that a finding of noncompliance would not result in any effort on Plaintiffs' part to seek

---

4. In contrast, the September 30, 2000 date initially proffered by Defendants provides too much leeway. To measure compliance significantly after the hard and fast dates established in the Settlement Agreement—particularly, as here, where the agreement also established specific numbers of class members to be served—would unfairly dilute the import of the notification and mediation process. If given too much leeway, Defendants potentially could avoid full compliance until faced with a formal motion.

further relief. Indeed, Defendants claimed at oral argument on December 4, 2000, that they were then virtually one hundred percent in compliance.

### 2. How is "Substantially Complying" Defined?

The second subsidiary question concerns the definition of the phrase "substantially complying" vis a vis paragraphs fifteen and sixteen. To resolve this issue, the court has found it necessary to analyze both the words "complying" and "substantially" as used in paragraph thirty-two of the Settlement Agreement.

### a. "Complying"

The meaning of the word "complying" (and "substantially" for that matter) obviously depends on the substantive paragraph or paragraphs alleged to have been violated. With respect to the instant motion, paragraphs fifteen and sixteen call for Defendants to "provide or arrange for ... specialized services." Unfortunately, the parties do not agree on the meaning of "specialized services." Their dispute hinges on whether, in "providing or arranging for ... specialized services," Defendants must ensure "active treatment." This dispute must be resolved not only because its resolution may affect whether Defendants were in substantial compliance as of June 30, 2000, but to guide the parties', if not the court's, future steps.

The court obviously would have preferred that the parties were clear about the meaning of the term "specialized services" as used in the Settlement Agreement. In the absence of such clarity, however, and "[t]o the extent that the questions presented turn on the language of the settlement agreement or other con-

tracts, [the court] ha[s] considerable freedom to draw [its] own conclusions, guided by the language of the agreement, the circumstances of its formulation and its purposes—'in brief, by the usual considerations of contract interpretation.'" *Accu-Soft Corp. v. Palo,* 237 F.3d 31, 39–40 (1st Cir.2001) (quoting *AMF, Inc. v. Jewett,* 711 F.2d 1096, 1102 (1st Cir.1983)).

■ Plaintiffs maintain that the Settlement Agreement clearly and unequivocally mandates the provision of "specialized services" in the form of individualized programs of active treatment. In reply, Defendants assert that Plaintiffs wrongfully equate "specialized services" with "active treatment" and, thereby, improperly seek relief beyond the scope of the Settlement Agreement. The parties' respective arguments have required the court to travel through a statutory and regulatory maze. In the end, the court finds that Plaintiffs have the better argument.

The Settlement Agreement defines "specialized services" by reference to 42 C.F.R. § 483.120(a)(2) and § 483.440(a). (See Settlement Agreement ¶¶ 2(d), 14.)[5] Section 483.120(a)(2) provides as follows: "For mental retardation, specialized services means the services specified by the State which, combined with services provided by the [nursing facility] or other services providers, results in treatment which meets the requirements of § 483.440(a)(1)." 42 C.F.R. § 483.120(a)(2). In turn, subsection (1) of section 483.440(a) defines standards for "active treatment" as follows:

> Each client must receive a continuous active treatment program, which includes aggressive, consistent implementation of a program of specialized and

---

**5.** The Settlement Agreement also refers to 42 U.S.C. § 1396r(e)(7)(G)(iii) in defining "specialized services." (*Id.* ¶ 14.) But for an exception apparently not relevant here, that

statutory provision merely states that "[t]he term 'specialized services' has the meaning given such term by the Secretary in regulations." 42 U.S.C. § 1396r(e)(7)(G)(iii)(2001).

generic training, treatment, health services and related services described in this subpart, that is directed toward—(i) The acquisition of the behaviors necessary for the client to function with as much self determination and independence as possible; and (ii) The prevention or deceleration of regression or loss of current optimal functional status.

42 C.F.R. § 483.440(a)(1). In essence, active treatment is a continuous, aggressive program that is designed to enable a client to function with optimal independence and to guard against the loss of that ability. *See id.*

Despite this apparently clear mandate, Defendants assert that their obligation to provide such "active treatment" is diluted in several ways. First, they argue that active treatment results from a *combination* of services provided by both Defendants and nursing facilities or other service providers. Thus, Defendants claim, it is not their regulatory obligation to meet the "active treatment" standard on their own; the services provided by nursing facilities, over which the court has no jurisdiction in this matter, are part of the equation.

Second, Defendants appear to argue that active treatment means something different for persons with mental retardation in nursing facilities than it does for persons with mental retardation in all other settings. In support, Defendants rely on a regulation which governs PASARR evaluations, 42 C.F.R. § 483.136(a). Section 483.136(a) states that its purpose is to identify the minimum data needed to determine whether or not the applicant or resident with mental retardation "needs a continuous specialized services program, which is analogous to active treatment, as defined in ... § 483.440 of this chapter." 42 C.F.R. § 483.136(a). Section 483.440, it must be remembered, establishes the ac-

tive treatment standard. "[A]nalogous" services, Defendants argue, do not equate with "active treatment."

Defendants' arguments cannot carry the day. The "analogous" language they rely on is contained in a regulation which describes a data-gathering process, not the definition of specialized services. This sole reference to analogous services simply directs MetroWest, the Department of Mental Retardation ("DMR")'s PASAAR agent, to review certain dates when deciding whether an individual needs specialized services. It does not alter the definition of active treatment. Significantly, MetroWest, in fulfilling this directive, incorporates the active treatment standard verbatim in its PASARR instrument and instructs reviewers to apply this standard—without modification or dilution for nursing facility residents—when assessing an individual's need for specialized services. (See Plaintiffs' List of Exhibits (Docket No. 190) ("Plaintiffs' Exhibits"), Exhibit 12 at 8.) Indeed, the PASARR form, echoing yet another regulatory provision, 42 C.F.R. § 483.120(d)(2), makes clear that *"[t]he State* must provide or arrange for the provision of specialized services by the individual while he or she resides in the [nursing facility]." (*Id.* (emphasis added).)

The court also finds that there is no measurable difference between active treatment in private nursing homes and state-owned facilities. In this regard, the Department of Health and Human Services ("HHS") itself, in commenting on the regulations, made clear that "the definition of active treatment contained in section 483.440(a)(1) is not tied to *institutional* care" and that "th[e] definition is as relevant to services outside [such] an institution as it is to services inside [such] an institution." 57 Fed.Reg. 56,475 (emphasis added). Moreover, HHS considered and rejected comments that the active treat-

ment standard placed nursing facilities "in the business of being an [intermediate care facility for mental retardation]." 57 Fed. Reg. 56,476. Stated another way, it is the state which must ensure that specialized services meet active treatment standards.[6]

At bottom, Defendants must ensure that Plaintiffs do not fall into the cracks between state-offered services and private nursing facilities. "Active treatment" is not merely aspirational. It means the same thing for residents of nursing facilities as it does for residents of institutional or community programs. That is the intent of federal law and, by incorporation, the Settlement Agreement. This is particularly important given the fact that, by operation of the agreement, many class members who are nursing home residents will not be placed into community residences for several years to come. If Defendants are not able to demonstrate—by reference to both the services it provides and those provided by a nursing facility—that an individual is receiving active treatment, the court, in the absence of nursing facility data, may only consider the services provided by the state in measuring compliance with the Settlement Agreement and, in turn, applicable federal regulations.

### b. "Substantially"

As indicated, paragraph thirty-two provides that, in order to avoid having the stay lifted, Defendants must be "substantially" complying with the Settlement Agreement. Other than agreeing that "substantially" does not mean "fully" complying, the parties are at odds with respect to the level of proof necessary to demonstrate noncompliance.

Despite their disagreement, both sides point the court to *Fortin v. Comm'r of Ma.*

*Dep't of Public Welfare,* 692 F.2d 790 (1st Cir.1982), for guidance. There, the First Circuit upheld the trial court's decision to hold the defendants in contempt of the parties' consent decree. That decree had obligated the defendants to make prompt determinations of eligibility for two separate welfare programs. At the time the trial court issued its ruling, the most recent statistics showed average compliance rates of around ninety-four percent for the two programs. On appeal, the defendants argued that their average compliance rates were comparable to the ninety-six percent compliance rates which had been found to satisfy a substantial compliance standard in *Shands v. Tull,* 602 F.2d 1156, 1161 (3d Cir.1979). The First Circuit concluded, however, that "no particular percentage of compliance can be a safe-harbor figure, transferable from one context to another." *Fortin,* 692 F.2d at 795. (citation omitted). "Like 'reasonableness,' " the court explained, " 'substantiality' must depend on the circumstances of each case, including the nature of the interest at stake and the degree to which noncompliance affects that interest." *Id.* The court went on to find in the matter before it that "the interest at stake—entitlement to subsistence-level benefits—is great, ... making the consequences of failure to comply quite serious." *Id. See also Morales–Feliciano v. Parole Bd. of the Com. of Puerto Rico,* 887 F.2d 1, 4 (1st Cir.1989) (high degree of compliance required where noncompliance puts prisoner's Eighth Amendment interests at risk).

In the present matter, the court believes that Plaintiffs' burden is somewhat less heavy than the plaintiffs' burden in *Fortin.* The *Fortin* plaintiffs had to prove substantial noncompliance in support of a motion

---

**6.** Granted, to meet their obligations Defendants can incorporate those services which are in fact provided independently by nursing homes. But if a private nursing facility fails to provide supplemental services as part of the equation, despite an arguably independent obligation to do so, the responsibility remains Defendants'.

for contempt. A court's ability to use its contempt power is "one of the most potent weapons in the judicial armamentarium." *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir.1991). Thus, "courts are to construe ambiguities and omissions in consent decrees as redounding to the benefit of the person charged with contempt." *Gilday v. Dubois*, 124 F.3d 277, 282 (1st Cir.1997) (citations and internal quotation marks omitted). Here, in contrast, the Settlement Agreement, by its very terms, is not enforceable by contempt. (Settlement Agreement ¶ 27.) Proof of noncompliance merely results in a potential lifting of the stay, only thereafter enabling Plaintiffs to seek injunctive or other relief based on "then existing facts and law." Thus, the consequences of substantial noncompliance are much less problematical for Defendants. Accordingly, Defendants' level of compliance must be greater than that required in *Fortin* for them to avoid having the stay lifted.

■ The court is also inclined to enforce the requirements of the Settlement Agreement strictly insofar as numerical standards have been incorporated therein. *See Halderman v. Pennhurst State Sch. and Hosp.*, 901 F.2d 311, 319 (3rd Cir. 1990). As Plaintiffs argue, numerical standards, unlike more subjective terms like "adequate care," are relatively easy to assess. Thus, the court can properly assume that, to the extent Defendants bargained for numerical standards, they clearly understood the extent of their obligations. *See United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *Ricci v. Okin*, 537 F.Supp. 817 (D.Mass.1982).

3. *Were Defendants Substantially Complying with Paragraphs Fifteen and Sixteen on June 30, 2000?*

■ The court believes that the factors outlined above call for a finding of noncompliance with paragraphs 15 and 16 as of June 30, 2000. The interests at stake— specialized services to mentally retarded and developmentally disabled individuals in nursing homes—is "great," *Fortin*, 692 F.2d at 795, particularly given the extensive period of time during which class members had been deprived of such services before this lawsuit commenced. Moreover, the "consequences of failure to comply" are "quite serious," *see id.*, namely, Plaintiffs' inability to have their daily lives more livable and their futures somewhat brighter. Before zeroing in on the measuring date of June 30, 2000, however, the court will describe events prior to that date.

a.

There is little question that Defendants were not substantially complying with the requirements of paragraph fifteen on December 31, 1999, or paragraph sixteen on April 30, 2000. Although Defendants' summary charts for both dates give the impression that specialized services had been provided in a timely manner to most class members, (see Affidavit of John Riley (Docket No. 173) ("Riley Affidavit"), Exhibit C), a careful analysis shows something quite different.

As Plaintiffs argue, Defendants appear to have provided specialized services to only seventy-three percent of the 858 class members who were to receive such services as of December 31, 1999. (See Plaintiff's Reply Brief (Docket No. 189) ("Plaintiffs' Reply") at 12–13.) Defendants' summary charts as of that date purport to document that 573 class members were receiving "all" specialized services as of that date. However, DMR's contemporaneous analysis indicates that far fewer class members actually received

all of the recommended specialized services. For example, DMR's Assistant General Counsel reported to Plaintiffs' counsel on March 22, 2000, that, with respect to the period ending December 31, 1999, "[a]pproximately thirty percent" of these identified individuals as receiving "All Specialized Services" were only "constructively receiving all [such] services." (Plaintiffs' Exhibits, Exhibit 4.) Thus, many class members included in the "All Specialized Services" groups actually had some services deferred by DMR as not being clinically appropriate. (*Id.;* see also Riley Affidavit ¶ 56.)

Defendants acknowledge that this subset of "constructive all" has "caused the most vigorous disagreement" between the parties. (Riley Affidavit ¶ 56.) However, Defendants assert that they have the right to exercise clinical judgment about the delivery of specialized services in particular cases. Accordingly, Defendants distinguish between the service "needs" areas identified in a PASARR and the actual services to be chosen and provided by Defendants themselves.

Paragraph seventeen of the parties' agreement requires Defendants to "provide or arrange for the services necessary to meet all the specialized service needs identified in the most recent PASARR report." Those services are to be provided, the paragraph goes on, "unless that individual or her guardian on her behalf makes an informed choice to refuse a particular service, after the Defendants offer a particular service and make reasonable efforts to inform the individual or her guardian of that service and encourage the individual or her guardian to visit or observe the service being offered or comparable services." This language echoes the language set out in the parties' Interim Agreement on Specialized Services ("Interim Agreement") of March 11, 1999, at which time the provision of specialized services to Plaintiffs was to commence.

While there may indeed be some flexibility between identified "service needs" and "actual services" provided, there is no doubt that an identified "need" requires an appropriate "service." In this respect, Defendants' December 31, 1999 chart reveals even more fundamental problems. First, sixty-two class members who are listed as having been recently admitted to nursing facilities (actually pediatric nursing homes) were admitted years ago and were still not receiving specialized services under anybody's definition. (Riley Affidavit ¶ 64.) Moreover, at least seven additional individuals have had *all* their services "clinically deferred," and three more individuals have been deemed clinically inappropriate for *any* services despite those services having been identified as appropriate in their PASARR reviews. (See *id.,* Exhibit C (December 31, 1999 chart).)

In sum, as of December 31, 1999, approximately 217 individuals (including approximately 145 who had some of their services deferred) out of 574—848 in the group less those who had died (116), refused services (71), moved (61) or were no longer in need (26)—were not receiving all services identified in the PASARR review. This represents thirty-eight percent of the subject individuals—or an unacceptable compliance rate of sixty-two percent.

It should be noted that the above calculations assume, as arguably asserted by Defendants, that sixty-two percent of the applicable sub-group was in fact receiving "all" the services identified in this PASARR review. This too, however, is challenged by Plaintiffs based on at least three sources of alternative data. First, Plaintiffs' review of MetroWest's own data indicates that as much as seventy percent of services were not provided. Second, affidavits of certain nurses who were provid-

ing services supports, at least anecdotally, the conclusion that services were not provided in many instances. Third, Plaintiffs' experts' analyses of random samples indicate repeated failures to provide all services. Defendants, in turn, argue that at least part of the problem may be attributable to "sequence" or "tolerance" issues in individual cases.

Be that as it may, the situation as of December 31, 1999, was not unexpected. That date, it must be remembered, originally was established in the Interim Agreement. Apparently, however, because of a delay in implementing the Interim Agreement, among other reasons, the parties agreed in the final Settlement Agreement to permit Plaintiffs to seek enforcement only after April 30, 2000. (See Settlement Agreement ¶ 29.) Thus, even before the Settlement Agreement was approved on January 10, 2000, the parties knew that Defendants were behind schedule.

If the only issue at the present time was Defendants' compliance as of December 31, 1999, the parties would not be here. Unfortunately, based on Defendants' own data, the situation was not significantly different as of April 30, 2000. Indeed, Defendants conceded at oral argument that they did not meet the numerical requirements of paragraphs fifteen and sixteen by April 30, 2000, although they asserted that this failure did not equate with substantial noncompliance under paragraph thirty. With this background, the court turns to the crux of the matter: Defendants' compliance on June 30, 2000.

b.

Unfortunately for Defendants, the situation was not significantly different on June 30, 2000. At best, as Plaintiffs argue, Defendants' compliance crept toward seventy-five percent by that time.[7] Even so, as Plaintiffs describe, Defendants' own reports indicate that at least eighty-one class members were not receiving services by June 30, 2000. (Plaintiffs' Reply at 13–14.) This represents fourteen percent of the five hundred and seventy-four subject individuals—or an unacceptable compliance rate of eight-six percent. These individuals had projected dates for the receipt of services that were often several months away.

However one slices Plaintiffs' argument, on June 30, 2000—six months after the initial deadline and two months after the second deadline—at least fourteen percent of those recommended for specialized services were not receiving them. Thus, given the factors described above, Defendants, as of the measuring date of June 30, 2000, were still "not substantially complying with their obligations under paragraphs fifteen and sixteen of the Settlement Agreement." Most problematically, this finding is based on Defendants' own figures, which Plaintiffs assert significantly understate the problem.[8]

If by implication only, Defendants appear to concede their lack of substantial compliance by June 30, 2000. For that reason, perhaps, they vigorously maintained at oral argument that they were in virtually full compliance as of October 30,

---

7. By way of example only, according to DMR's June 30, 2000 report, one class member who had been waiting for specialized services since at least July of 1998 was still not receiving four recommended services by the end of June, 2000, nor was she scheduled to receive them until late October of that year.

8. Plaintiffs claim, for example, that DMR's designated agent for PASARR evaluations has documented in its annual reviews that specialized services are not being provided to persons whom DMR reports as receiving all services. (See Plaintiffs' Reply at 14 and Exhibits cited therein.)

2000. (See also Supplemental Affidavit of John E. Riley (Docket No. 194) ("Riley Supplemental Affidavit"), (Exhibit A Nov. 29, 2000).) They point out as well that the "constructive all" and "clinically deferred" categories are no longer utilized. In addition, Defendants argue that certain MetroWest miscategorizations have since been corrected and that certain problems with the provision of services to particular individuals have been remedied. (See also Riley Supplemental Affidavit ¶ 5 (anticipating that at least seventy percent of MetroWest's inaccurate need statements will be eliminated in the next PASARR cycle) and ¶ 6 (indicating that steps had been taken to remedy under-reporting of day habilitation services).) For the reasons described, however, Defendants arguments are too little too late.

The court adds a final point. In one way, the parties appear to agree that the Settlement Agreement has required them to enter unchartered areas. For that reason, perhaps, Defendants' "ramp up" has delayed the provision of all services to members of the class. The court believes, however, that its finding of noncompliance—based on Defendants' own figures—is likely more problematical than the figures themselves reveal. As indicated, Defendants' definition of specialized services is narrower than the "active treatment" required by federal law. Thus, to the extent that Defendants have not applied an active treatment standard to its compliance efforts, the level of compliance was and perhaps continues to be significantly less. At bottom, the court finds that as of June 30, 2000, Defendants were not substantially complying with paragraphs fifteen and sixteen of the Settlement Agreement.

### B. *Lifting of the Stay*

Having found that as of June 30, 2000, Defendants were not substantially comply-

ing with paragraphs fifteen and sixteen of the Settlement Agreement, the court "may lift the stay imposed under paragraph 28." (Settlement Agreement ¶ 32.) While use of the term "may" connotes that a lifting of the stay is not mandatory, the court deems it appropriate, for the reasons cited above, to lift the stay here. Thus, with regard to the issues discussed herein, further proceedings in this case are no longer stayed.

### III. *CONCLUSION*

For the foregoing reasons, Plaintiffs' motion, to the extent it seeks a finding of substantial noncompliance as of June 30, 2000, and a lifting of the stay with respect to paragraphs fifteen and sixteen of the Settlement Agreement, is ALLOWED. If they wish, Plaintiffs, with reference to specialized services, are now free to "seek injunctive and other relief based upon the then existing facts and law." (Settlement Agreement ¶ 32.)

IT IS SO ORDERED.