Loretta ROLLAND, et al., Plaintiffs

v.

Deval PATRICK, et al., Defendants.

Civil Action No. 98–30208–KPN.

United States District Court,
D. Massachusetts.

April 10, 2007.

108

Cathy E. Costanzo, Steven J. Schwartz, Center for Public Representation, Matthew Engel, Disability Law Center, Inc., Northampton, MA, Frank J. Laski, Mental Health Legal Advisors Committee, Richard D. Belin, Catherine H. Wicker, Jeffrey S. Follett, Foley Hoag LLP, Boston, MA, for Plaintiffs.

William W. Porter, David A. Guberman, Deirdre Roney, Kenneth W. Salinger, Office of the Attorney General, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER WITH REGARD TO PLAINTIFFS' MOTION FOR NONCOMPLIANCE AND FURTHER RELIEF (Document No. 396)*

NEIMAN, Chief United States Magistrate Judge.

Presently before the court is Plaintiffs' motion for noncompliance and further relief based on Defendants' alleged failure to provide "active treatment" to a class of mentally retarded and developmentally disabled individuals residing in nursing facilities. Defendants' obligation to provide active treatment to these class members has been the subject of several disputes, the last culminating in the court's order of July 23, 2003, that, no later than December 30, 2003, "Defendants must provide service plans and active treatment to each and every class member for whom specialized services is appropriate." *Rolland v. Romney*, 273 F.Supp.2d 140, 141 (D.Mass.2003).

In particular, Plaintiffs' motion asks that the court do the following: (1) find that Defendants have not complied with their obligations pursuant to the court's previous order; (2) require Defendants to revise the active treatment measuring device, their active treatment guidelines and the active treatment evaluation process; (3) appoint a court monitor to review each class member's service plan; (4) require Defendants to submit a quarterly report to

the court monitor; (5) require Defendants to certify that no class member is to be admitted to a nursing facility if there is an alternative program for that individual; (6) require Defendants to certify that no class member who needs specialized services is admitted to a nursing facility which cannot provide all recommended specialized services and active treatment upon admission; and (7) require Defendants to create an appropriate community placement for each class member for whom Defendants fail to provide active treatment. In response, Defendants maintain that they are in full compliance with the court's previous order. Moreover, Defendants argue, the present dispute is not about any refusal to provide active treatment but, rather, Plaintiffs' persistent dissatisfaction with nursing facilities as a residential setting for class members with mental retardation.

After some initial skirmishing, the court established a fact cut-off date of December 31, 2005, and heard oral argument on October 4, 2006. Now, having provided Defendants the opportunity to supplement their opposition, the court has before it sufficient evidence to rule on Plaintiffs' motion. For the reasons which follow, the court will allow the motion, but not grant all the relief Plaintiffs seek.

## I. BACKGROUND

In light of the importance of the issue and the extensive relief sought, the court sets forth in some detail the procedural background to the current dispute. It then turns to the particular legal and factual matters at issue.

### A. Procedural Background

The court entered its first order relevant to the instant matter on March 11, 1999, when it approved the parties' interim settlement agreement. (See Document No. 71.) That agreement required Defendants to provide "specialized services" to all class members who had been determined by a Preadmission Screening and Resident Review ("PASARR") process to need such services. The interim agreement also established the following compliance schedule: by December 31, 1999, Defendants had to provide specialized services for the 858 class members who had previously been determined to need, but were not receiving, such services; by April 30, 2000, Defendants had to provide specialized services for all persons found to need these services through PASARRs conducted between July of 1998 and January of 2000; and Defendants had to offer specialized services within ninety days of admission to all persons determined to need these services after February 1, 2000.

The second relevant order was the court's approval of the parties' Settlement Agreement (Document No. 116) on January 10, 2000. *See Rolland v. Cellucci*, 191 F.R.D. 3 (D.Mass.2000). In applicable part, the Settlement Agreement required as follows with regard to specialized services:

The Defendants shall provide or arrange for the provision of specialized services, as defined by 42 U.S.C. § 1396r(7)(G)(iii) and 42 C.F.R. §§ 483.120, 483.440(a), to all Massachusetts residents, as defined in 42 C.F.R. §§ 483.110 & 435.403, with mental retardation or developmental disabilities who currently reside in nursing homes in the Commonwealth and who have been determined, pursuant to 42 U.S.C. § 1396r(7)(B)(ii)(II), to need such services. Consistent with the Defendants' policies and regulations, the Defendants may satisfy their obligations under this Agreement by providing class members with appropriate community residential and other supports.

(Settlement Agreement ¶ 14.) The Settlement Agreement also established a further implementation schedule. (*Id.* ¶¶ 15–18.)

In response to Plaintiffs' motion, a third order issued on March 27, 2001, in which the court found Defendants in noncompliance with paragraphs 15 and 16 of the Settlement Agreement with regard to specialized services. *See Rolland v. Cellucci,* 138 F.Supp.2d 110, 118–19 (D.Mass.2001). The court addressed the meaning of "active treatment" and stated as follows:

> At bottom, Defendants must ensure that Plaintiffs do not fall into the cracks between state-offered services and private nursing facilities. "Active treatment" is not merely aspirational. It means the same thing for residents of nursing facilities as it does for residents of institutional or community programs. That is the intent of federal law and, by incorporation, the Settlement Agreement. That is particularly important given the fact that, by operation of the Agreement, many class members who are nursing home residents will not be placed into community residences for several years to come.

*Id.* at 117.

The court entered its fourth relevant order on May 3, 2002. *See Rolland v. Cellucci,* 198 F.Supp.2d 25 (D.Mass.2002). Although the court was "reluctant to redesign the entire structure of service delivery," it required Defendants to establish and promptly implement a program of active treatment to all nursing facility residents who needed specialized services. *Id.* at 46. The court also required that Defendants ensure a single case manager and single treatment plan for each class member in a nursing facility, develop a measuring device for evaluating compliance with the federal active treatment mandate, and train staff accordingly. *Id.* Defendants appealed but did not seek a stay of the court's order. The First Circuit affirmed the court's decision on January 28, 2003. *Rolland v. Romney,* 318 F.3d 42, 57–58 (1st Cir.2003).

Meanwhile, on August 14, 2002, the court entered its fifth order when it found that Defendants' active treatment policy—developed in response to the May 3, 2002 order—was deficient in a number of ways, particularly its multiplicity of treatment plans. (See Document No. 333.) Finding that Defendants' policy displayed "a continued resistance to the active treatment standard" by failing to provide "all class members [with] a program of active treatment irrespective of where they receive their services," the court ordered Defendants to revise the policy with a single integrated treatment plan. (*Id.* at 7–10.) Defendants thereafter revised the policy and developed a Rolland Integrated Service Plan or "RISP," but that, too, was the subject of additional objections, another hearing, and further court-ordered modifications. A revised policy was issued by Defendants on December 6, 2002.

The court entered yet another order with regard to specialized services on July 23, 2003, when it refused to hold Defendants in contempt, as sought by Plaintiffs, but made "clear that, to the extent there has been any ambiguity in its previous orders, Defendants must provide service plans and active treatment to each and every class member for whom specialized services is appropriate by December 30, 2003, lest contempt sanctions thereafter be imposed." *Rolland,* 273 F.Supp.2d at 141. The court then issued the following warning:

> [I]n implementing the May 3, 2002 order—and having more than enough time to do so—Defendants should be well aware of the heightened scrutiny which the court will exercise should Plaintiffs' concerns about active treatment remain.

In short, while the court will deny the instant motion, it will not countenance any further delay in providing service plans and, hence, active treatment. *In the words of Defendants' counsel, each member of Plaintiffs' class shall be provided active treatment by December 30, 2003, "not one day later."*

*Id.* at 144 (emphasis added).

Presently, Plaintiffs claim that, despite the passage of time, the majority of class members still are not receiving active treatment. "Absent an exceptional remedy," Plaintiffs assert, " 'the tortuous history of the litigation' will continue, and there will be little reality to the promise of 'specialized services to the class [that] have been a long time coming at levels mandated by federal law.' " (Document No. 397 ("Plaintiffs' Brief") at 6 (quoting *Rolland*, 273 F.Supp.2d at 143).)

## B. *Factual Background*

It is undisputed that since the court's last order in July of 2003—and prior to Plaintiffs filing the present motion—Defendants conducted six semi-annual reviews of active treatment. The reviews are based upon an eleven-point Active Treatment Measuring Device ("ATMD"). It is also undisputed that Defendants submitted the original ATMD to the court in July of 2002, but that Plaintiffs opposed Defendants' version, arguing that it failed to track the federal regulations and did not provide sufficient detail or specific criteria for evaluating active treatment. In its August 14, 2002 order, however, the court found that the ATMD was "adequate at this time," albeit subject to certain court-ordered changes. (Document No. 333 at 9.)

Defendants thereafter developed guidelines for their reviewers to use when evaluating services for class members. Al-though the initial reviews did not use these guidelines, then in draft form, each semi-annual review since 2004 has been based upon the guidelines as they continued to evolve. Those guidelines describe both the process a reviewer should use when gathering information, as well as criteria to apply when assessing active treatment. Suffice it to say for present purposes, Defendants' reviews have invariably concluded, in reports made available to Plaintiffs, that virtually all class members have been receiving active treatment.

Believing that Defendants' conclusions were inconsistent with their own observations, as well as anecdotal reports from families and nursing staff, Plaintiffs employed Dr. Sue Gant as an expert to evaluate the sample of class members Defendants reviewed in December of 2004 and June of 2005. Much of the parties' present dispute centers on Dr. Gant's conclusion that Defendants were not in substantial compliance with their own active treatment policy.

## III. DISCUSSION

The court's discussion proceeds in three parts. First, the court will frame the issue. Second, the court will address a lingering "active treatment" question. And third, the court will assess Defendants' compliance with their active treatment obligations.

## A. *Framing the Issue*

█ Plaintiffs' motion is entitled a motion for "noncompliance." That reference is not quite accurate, in the court's view, because there is no provision of the Settlement Agreement directly in dispute; as indicated, Defendants had already been found in noncompliance with paragraphs 15 and 16 as they relate to specialized services. *See Rolland*, 138 F.Supp.2d at 120.[1] Rather, the court believes, it is De-

---

1. In essence, the court determined that "sub-

stantial compliance" with the Settlement

fendants' compliance with its subsequent orders which are at issue, particularly its order of July 23, 2003. As described, that order required Defendants to provide service plans and active treatment to each and every class member "by December 30, 2003, 'not one day later.'" *Rolland*, 273 F.Supp.2d at 144 (quoting Defendants' counsel).

For their part, Defendants would have the court treat Plaintiffs' motion as one for civil contempt with the attendant standard of "substantial compliance" employed by the First Circuit. *See Morales–Feliciano v. Parole Bd. of Puerto Rico*, 887 F.2d 1, 4–5 (1st Cir.1989); *Fortin v. Commissioner of Mass. Dep't of Pub. Welfare*, 692 F.2d 790, 797 (1st Cir.1982). Citing *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.*, 1991 WL 261654, at *1 (E.D.Pa. Dec.6, 1991), Defendants assert that a party can demonstrate substantial compliance in the context of a contempt motion through reasonable diligence and energy in attempting to comply with court orders. They meet this standard, Defendants claim, not only because they devoted an extraordinary amount of time and resources to comply with this court's orders—in contrast to the situation in *Halderman v. Pennhurst State Sch. & Hosp.*, 154 F.R.D. 594, 608–09 (E.D.Pa.1994), where the defendant disregarded the terms of a court's order and "attempted to cover up its noncompliance with a flurry of activity ... just prior to and during the hearings"—but because they in fact have implemented an active treatment policy.

Defendants' arguments to the contrary, this court's December 30, 2003 order left little, if any, room for noncompliance even by way of effort. Defendants were ordered to *fully* comply with the court's order and guarantee an effective policy of active treatment, not merely make efforts

toward that end. Thus, it is not really Defendants' effort that counts but, given the remedial nature of the court's previous orders, the outcome of that effort as it concerns class members. *See, e.g., Palmigiano v. DiPrete*, 700 F.Supp. 1180, 1194 (D.R.I.1988) (efforts not relevant to the determination of compliance); *cf. McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949) ("The absence of willfulness does not relieve [a party] from civil contempt.... The decree was not fashioned so as to grant or withhold its benefits dependent on the state of mind of respondents. It laid on them a duty to obey specified provisions."). For the reasons which follow, the court finds that Defendants have failed to fully comply, let alone substantially comply, with those orders.

## B. *"Active Treatment" Red*

■ Before addressing Defendants' compliance in greater detail, however, the court finds it necessary, unfortunately, to revisit the "active treatment" standard, which also stands at the center of the compliance issue. Defendants' opposition to Plaintiffs' motion is, in many ways, a reprise of their argument before the First Circuit regarding the legitimacy of this court's order that they implement a policy of active treatment under 42 U.S.C. § 1396r, a part of the Nursing Home Reform Amendments ("NHRA") to the Medicaid law. *See Rolland*, 318 F.3d 42, 44 (1st Cir.2003). In particular, Defendants again appear to challenge the degree to which specialized services for individuals with mental retardation in *nursing homes* have to incorporate active treatment standards for mentally retarded individuals in state-run *intermediate care facilities* for such individuals ("ICF/MR"). The resolu-

Agreement does not mandate "full" compliance. *See id.* at 117.

tion of this question, Defendants maintained at oral argument, could be "determinative" of the parties' present dispute. (Document No. 424 ("Transcript") at 64.)

With welcomed candor, Defendants acknowledge that they do not meet—nor do they believe they are required to meet—the ICF/MR standards for nursing homes, including the more specific aspects of active treatment which are incorporated into the ICF/MR standards. Of course, if Defendants are wrong about their obligations, the court would have little choice but to find them in noncompliance with this court's active treatment orders. Defendants argue, however, that the First Circuit "expressly rejected" Plaintiffs' argument that, in providing specialized services to the mentally retarded in nursing homes, "states are required to comply with 'every obligation placed on them in their broader role in ICF/MRs.'" (Document No. 420 ("Defendants' Reply") at 2 (quoting *Rolland*, 318 F.3d at 57).) For the reasons which follow, Defendants' arguments are unpersuasive.

First, contrary to Defendants' assertions, Plaintiffs recognize that not every ICF/MR requirement—*e.g.*, those dealing with environmental and structural issues—governs conditions in nursing homes that serve persons with mental retardation. (See Document No. 409 ("Plaintiffs' Reply") at 10 n. 7; Transcript at 23.) Second, and more importantly, Defendants' invocation of the First Circuit's decision is misdirected. The language cited by Defendants—described by them as "rejecting" Plaintiffs' position with regard to ICF/MR standards in nursing homes—is actually preceded by the phrase, "[c]on-

trary to the Commonwealth's protestations." *Rolland*, 318 F.3d at 57. In other words, the First Circuit was not rejecting *Plaintiffs'* argument but, rather, *Defendants'* argument that an active treatment standard was not only beyond their obligations, but unattainable. *See id.* In essence, the First Circuit determined that, although Defendants were not required to comply with every regulation applicable to ICF/MRs, they were required to implement the "active treatment" aspects of the regulations as that term concerned mentally retarded residents of nursing facilities. *See id.* at 56–57. With that in mind, the First Circuit explained, the Secretary of Health and Human Services had crafted a definition of specialized services for nursing home residents "that incorporated the active treatment standard traditionally applied in ICF/MRs." *Id.* at 57. In particular, the Secretary had "defined specialized services for these individuals as 'the services specified by the State which, combined with services provided by the [nursing facility] or other services providers, results in treatment which meets the active treatment requirements of [42 C.F.R.] § 483.440(a)(1).'" *Id.* (quoting 42 C.F.R. § 483.12(a)(2).) This court's interpretation of federal law, the First Circuit concluded, was not in error. *See id.* at 43.[2]

Third, this court did not confine Defendants' compliance obligations only to subsection (a) of 42 C.F.R. § 483.440 (the active treatment standard which is part of the regulatory subpart governing ICF/MRs) or to 42 C.F.R. § 483.120(a)(2) (which is part of the regulatory subpart governing pre-admission screening and

---

2. It should also be noted that, in reaching this conclusion, the First Circuit rejected a number of other challenges by Defendants to this court's prior ruling, including arguments that this court had "conflated" the terms "active treatment" and "specialized services," *id.* at

56, that the NHRA does not require states to provide specialized services to dual-need residents, *id.* at 47–51, and that the right to specialized services was not privately enforceable, *id.* at 51–57.

medical review). Although these two provisions were the only ones specifically mentioned in the court's (and the First Circuit's) earlier ruling, it is clear that paragraphs (b) through (f) of section 483.440 apply as well. *See* 42 C.F.R. § 483.440(a) (incorporating all active treatment standards "described in this subpart"). For example, subsection (c) addresses individual program plans and subsection (d) requires that "each client must receive a continuous active treatment program consisting of needed interventions and services in sufficient number and frequency to support the achievement of the objectives identified in the individual program plan." 42 C.F.R. §§ 483.440(c) & (d). To the extent, therefore, that Defendants simply needed to know what standards to apply, as they indicated was the case at oral argument (see Transcript at 78), there they are.

## C. *Assessment*

While, as indicated, this reclarification of the active treatment standard might well be determinative, the court, giving Defendants the benefit of any doubt, has measured Defendants' compliance by the ATMD standard, under which they have operated, rather than the interpretive guidelines utilized by the Centers for Medicare & Medicaid Services ("CMS") for residents of ICF/MRs, proposed by Plaintiffs and utilized in connection with ICF/MRs. To be sure, the court has found some lingering factual disputes, but those disputes have not proven material enough to forestall its resolution of the matter. The court therefore turns to the heart of the issue, Dr. Gant's review.

The parties' respective positions with respect to the level of Defendants' compliance have varied over the course of their dispute. Dr. Gant's original review of February 27, 2005, included an evaluation of twenty class members, all of whom had previously been selected by Defendants for reviews in December of 2004 and June of 2005. (See Plaintiffs' Brief, Exhibit 2.) As part of that evaluation, Dr. Gant reviewed medical records, spoke with staff from nursing facilities and specialized services programs, and observed individuals in both settings. (*Id.* at 3–5.) In the end, she concluded that there were major deficiencies in the services provided to almost all twenty members of the sample and that only one was receiving active treatment. (See *id.* at 26.) In her view, these deficiencies, extrapolated to the class as a whole, were due to substantial problems with: (1) the development, accuracy, relevance, and periodic revision of the class members' treatment plans; (2) the training, supervision, and qualifications of nursing facility staff; (3) the quality, effectiveness, and involvement of service coordination; (4) the frequency and response to abuse and neglect in nursing facilities; and (5) the near total absence of discharge planning. (See *id.* at 27–28.)

In their initial response to Plaintiffs' motion, Defendants asserted that Dr. Gant's report was flawed in several ways. First, they argued that, due to a bias against nursing facilities as a proper venue for the care of the mentally retarded, Dr. Gant applied an incorrect assessment standard, *i.e.*, the CMS guidelines, rather than the ATMD approved by this court. Second, they contended that Dr. Gant improperly substituted her judgment for that of interdisciplinary teams charged with class members' care. Third, they asserted that, even if Dr. Gant's analysis was error-free, it was no substitute for three years of data using the ATMD which show that 100% of the sample class members had service plans and that 97% were receiving active treatment. Finally, Defendants argued that it is simply untrue that they have been resistant to implementing active

treatment to class members; if anything, they had taken additional steps even before Dr. Gant's review to improve the delivery of active treatment.

In response, Plaintiffs acknowledged that Dr. Gant prefers the CMS guidelines but assert that Dr. Gant had also applied the ATMD and had nonetheless found Defendants' compliance wanting. Still, faced with Defendants' objections to her methodology, Plaintiffs had Dr. Gant fully adopt Defendants' interpretation of the ATMD and re-measure Defendants' compliance. (See Document No. 419 ("Supplemental Report") at 7.) Even upon further review, however, Dr. Gant found that, although the number of persons who were receiving active treatment rose from one to nine out of twenty, eleven of the twenty were still not receiving active treatment under Defendants' guidelines. (See *id.*, Revised Report: Measuring Device for Active Treatment: CMS Active Treatment Standards, Compared to DMR Guidelines, Version 5/04 August 18, 2006, at 11.) The number of persons receiving active treatment under the CMS guidelines, Dr. Gant found, remained the same, one. (See *id.*)

As an initial matter, the court rejects Defendants' attempt to disqualify Dr. Gant as an expert. First, there is no doubt that Dr. Gant is qualified to opine on the subject matter presently before the court. Second, the sample size Dr. Gant used, as the court previously determined, can be reliable and the findings of such a review, if supported, may be afforded appropriate, if not significant, weight. See *Rolland,* 198 F.Supp.2d at 35. The sample was drawn from individuals *Defendants* randomly selected and included all class members who were reviewed by them in December 2004 and June 2005 (who had not died or moved) and who had signed consent forms. Third, the court finds that Dr. Gant's analysis stayed within the proper time-span

and referred to preceding events only when appropriate. Finally, Plaintiffs have adequately explained the differences between Dr. Gant's original report and her supplemental report, namely, (1) additional documentation used by Defendants but only later provided Dr. Gant as a result of this court's order of July 6, 2006, (2) events occurring after her November 2005 review and, as described, (3) a willingness to abide by Defendants' interpretation of the ATMD.

The court explored the parties' respective positions at oral argument on October 4, 2006, at which time it appeared that Plaintiffs had the better argument with respect to Defendants' noncompliance. Two examples suffice. First, Defendants asserted that Dr. Gant had often substituted her judgment for that of the team which had developed service plans. (See Transcript at 55–56.) But the example chosen by Defendants, J.T., actually proved the opposite, namely, that there was no documentation backing up the reduction of specialized services to her from three to two times per week. (See *id.* at 58–60; Supplemental Report, Revised Individual Profiles ("RIP") at 24.) Acknowledging that J.T. was perhaps not the best example to support their argument (Transcript at 60), Defendants pointed to another individual, E.P., for whom Dr. Gant had determined services were not adequate in frequency and intensity. (See Transcript at 61–63; Supplemental Report, RIP at 4.) Again, however, the example chosen supported Plaintiffs' assertion that E.P. was often provided significantly fewer hours of services because of staff shortages and had services interrupted through no fault of his own. (See Supplemental Report, RIP at 4–5.)

In response to Defendants' claim at oral argument that they had had inadequate time to review Dr. Gant's supplemental

report (see Transcript at 66–68), the court allowed them to supplement their opposition in writing. Interestingly enough, Defendants' supplemental brief concedes that two of the eleven individuals identified by Dr. Gant—E.P. and another individual, K.P.—were *not* receiving active treatment, albeit for reasons other than those cited by her. (See Document No. 421 ("Defendants' Supplement") at 6.) Those two individuals, of course, represent ten percent of the sample.[3]

The court has since spent considerable time analyzing the documentary record with regard to the remaining nine (of twenty) individuals who Defendants assert, Dr. Gant's findings to the contrary, were receiving active treatment: J.T., R.B., I.A., W.B., W.F., C.L., O.F., D.G. and M.A. Unfortunately for the class these individuals represent, the court finds that Plaintiffs' arguments better reflect evidence of noncompliance, albeit perhaps not quite by the degree Plaintiffs claim.

As to J.T., the court remains convinced, as it was at oral argument, that she had not been receiving active treatment. As described, the record indicates that there was no documentation backing up the reduction of specialized services to her from three to two times per week. (See Supplemental Report, RIP at 24.) Further, according to Dr. Gant, J.T's services do not meet the standard because, *inter alia,* "there is no indication of progress" and "the objective or strategy needs modification." (*Id.* at 24–25.) In addition, Dr. Gant stated, "[t]he lack of progress is not attributable to [J.T.'s] condition, but attributable to her plan." (*Id.* at 24.)

I.A., too, is shown by the evidence as having received only a fraction of the hours required by her service plan. (See *id.* at 60–61.) As a result, Dr. Gant concluded, I.A. was not "making progress toward [her] identified goals and objectives." (*Id.* at 60.) The court agrees.

Dr. Gant's profile of W.B.—a "very social and engaging" gentleman and longtime resident of a nursing facility—similarly concludes that Defendants were failing to provide him active treatment because there was no documentation of progress towards the communication and social objectives set out in his service plan. (*Id.* at 64–70.) For example, even though communication development had been identified as a priority for W.B. both in May and October of 2005, no tools to facilitate communications had been provided to him as of November 14, 2005. (See *id.* at 65.) Moreover, Dr. Gant found that there were serious deficiencies in the frequency and intensity of W.B.'s services, due in part to the loss of his day habilitation provider (see *id.* at 68–69); the problem, therefore, was not, as Defendants describe, simply an inconsistency between the nursing facility and the day habilitation center regarding W.B.'s goals and objectives. In addition, Defendants appear to ignore the fact that their own reviewers had found "that the services offered to W.B. during the period of September 25, 2005 to December 28, 2005 fell short of meeting W.B.'s needs and the team expectations." (Document No. 408 ("Defendants' Brief"), Affidavit of Kelly Lawless ¶ 12.)[4]

3. "In both cases," Defendants assert without further explanation, "the problems identified in the surveys have been remedied." (*Id.* at 6 n. 7.)

4. The court finds it entirely appropriate for Dr. Gant, as a general matter, to have analyzed inconsistencies between day habilitation and nursing facility plans. Granted, as Defendants argue, there may be reasons for some differences, *e.g.,* the amount of time spent in each facility, but, as indicated, the one example seized upon by Defendants, W.B., proves the opposite.

To be sure, Defendants' affiant stated with respect to W.B. that DMR "act[ed] quickly to resolve the issue." (*Id.*) But, even then, the timing of that resolution is somewhat suspect: Defendants' affiant explained—with questions and comments herein inserted by the court—that "[i]n less than 45 days [query, from when?] the decision had been made to refer W.B. to a new provider and in approximately 90 days [query, again, from when?] the necessary change was made [query, effective when?] to ensure W.B. was receiving the services he required." (*Id.*) "In fact," the affiant continued, W.B. as of May 23, 2006, "receives double the services he was receiving when served by [Greater Newburyport Opportunities] mobile." (*Id.*) Unfortunately, this "double dose" of services falls well outside the fact cut-off date.

This is true as well with regard to O.F. As Plaintiffs point out, Defendants' reviewer had answered "no" or "not applicable" to many of the ATMD questions but nonetheless found that O.F. was receiving active treatment. The assertion by Defendants' affiant that on May 23, 2006, "O.F. appears happy with the services offered to her" (*id.*, Affidavit of Dan Lincoln, ¶ 15), is hardly a counterweight to Dr. Gant's findings that services were inadequate in both frequency and intensity (Supplemental Report, RIP at 94–95). In any event, O.F.'s asserted satisfaction with the services offered comes well past the fact cut-off date.

The same appears true with regard to D.G. who, according to Dr. Gant, was not making documented progress toward identified goals. (*Id.* at 98–99.) The "anecdotal" notes to which Defendants refer (see Defendants' Brief, Affidavit of Karen Williams ¶ 13) are clearly inadequate, in the court's opinion, to counter Dr. Gant's

findings. Moreover, Defendants' conclusion that D.G. receives specialized services "now," *i.e.*, on May 23, 2006, (*id.* ¶ 14), was obviously too late for present purposes.

As for M.A., a resident of a Tewksbury nursing facility, the latest review upon which Defendants rely, April 11, 2006, also falls outside the fact cut-off date. (See *id.*, Affidavit of Fred Nazarro.) To be sure, M.A.'s situation does not appear to the court to be as dire as described by Dr. Gant, (see generally *id.* ¶¶ 5–15), but Dr. Gant's review is certainly not rife with "factual errors and misapplication of" the active treatment policy as Defendants' affiant claims (see *id.* ¶ 6).

In contrast, Plaintiffs' evidence with regard to the three remaining individuals falls short. C.L., for example, was characterized by Dr. Gant as making "no progress" towards her service plan's goal concerning ambulation. (Supplemental Report, RIP at 86–87.) In the court's opinion, the surveyor's notes, which the court has reviewed in some detail, reveal the opposite.[5] Similarly, the court accepts Defendants' explanation that any interruption in services to R.B. was related to his medical problems and to decisions made in consultation with his guardian. (Compare, *e.g.*, Supplemental Report, RIP at 28–29 with Defendants' Brief, Affidavit of Karen Williams ¶¶ 33–34.) This is true as well with regard to the interruption of services to W.F., although, as Plaintiffs point out, some of the interruptions were related to staffing, not health, issues. (Compare *e.g.*, Supplemental Report, RIP at 79 *et seq.* with Defendants' Brief, Affidavit of Sally Mueller ¶ 9 *et seq.*)

D. *Conclusions*

██ Taking into account all the evidence, the court finds that Defendants

5. By letter dated November 1, 2006, Defendants produced "the Department of Public Health surveyors' reports and notes for individuals as to whom there is a dispute whether active treatment is being provided." C.L. is included among that group.

failed as of December 31, 2005, to substantially, let alone fully, comply with the court's orders to provide active treatment to class members, under the ATMD standards. Even after adjusting Dr. Gant's findings for the reasons described above, eight of the twenty class members in the sample (E.P., K.P., J.T., I.A., W.B., O.F., D.G. and M.A.) were not receiving active treatment. This level of noncompliance (40%) is significant and unacceptable. The court therefore adopts the central finding of Dr. Gant's review: that the services provided by Defendants have too often failed to provide active treatment to class members. Plaintiffs' motion, therefore, will be allowed at least in part.

In coming to this conclusion, the court is not faulting Defendants' efforts to come to grips with their responsibilities. For example, it appears that Defendants have taken additional steps, both before and after the fact cut-off date, with regard to certain aspects of active treatment, including "carry-over" services. (See Defendants' Brief, Affidavit of Paul DiNatale ¶¶ 18–19.) It is also apparent from the record that a tremendous amount of work has been undertaken by nursing facility and day habilitation staff to serve Plaintiffs' class. Nonetheless, it is clear that the problems facing the class, which were meant to be addressed by the Settlement Agreement and the court's subsequent orders, remain to be resolved fully, effectively and finally.

To address the situation, the court will accept some, but not all, of Plaintiffs' proposals regarding remediation. First, Defendants will be required to amend the ATMD to reflect the CMS guildelines as they concern active treatment. To be sure, the ATMD may have once been deemed good enough by the court but, as Defendants acknowledged at oral argument, the ATMD has never received the court's "gold stamp of approval." (Transcript at 54.) The facts discussed above bear this out. The CMS guidelines, in the court's view, will enable reviewers to assess the *adequacy* of treatment plans, not simply their *existence*. In turn, the CMS guidelines will make the review standards for class members in nursing facilities consistent with similarly situated individuals in ICF/MRs, a consistency which ought to make matters easier, rather than more difficult, for Defendants.[6]

Second, in accord with Plaintiffs' request, the court will appoint a monitor who can oversee compliance in a much more timely manner than the court itself. As will be evident, however, the court will not adopt Plaintiffs' request that the monitor be empowered to create community alternatives for certain class members beyond what is required by the Settlement Agreement. The court is not convinced, upon the evidence presented, that Defendants' shortcomings with respect to active treatment has led to any direct failure on their part with regard to community placement.

## IV. CONCLUSION

For the reasons stated, and "ever mindful of [the NHRA's] overriding purpose, to protect individuals from being warehoused in nursing facilities and denied necessary services," *Rolland*, 318 F.3d at 48, the

---

**6.** As Defendants acknowledged at oral argument in response to the court's inquiry, "it would be great to be consistent." (*Id.* at 82; see also *id.* at 86–87.) Moreover, as Defendants pointed out, the Department of Public Health ("DPH") is already authorized and equipped to measure compliance via CMS guidelines at ICF/MRs, including the active treatment components of 42 C.F.R. § 483 Subpart C. (See Defendants' Brief, Affidavit of Paul DiNatale ¶ 5.) In addition, the Department of Mental Retardation ("DMR") operates six ICF/MRs and ought to be quite familiar with the ICF/MR guidelines. (See *id.* ¶ 9.)

court ALLOWS Plaintiff's motion, in part, and ORDERS as follows:

1. By May 15, 2007, Defendants, in consultation with Plaintiffs, shall revise the ATMD, the ATMD guidelines and the active treatment evaluation process so that it mirrors in all significant respects the CMS guidelines for assessing active treatment in ICF/MRs and so notify the court in writing of their compliance by that date.

2. Also by May 15, 2007, the parties shall jointly select and notify the court of the name of a court monitor who shall be appointed to fulfill the responsibilities set forth in the following paragraphs, the costs thereof to be borne by Defendants.

3. No later than December 31, 2007, and then again no later than April 1, 2009, the court monitor shall review each class member's plan and services and determine: (1) whether the class member has a RISP that accurately reflects his or her treatment needs; (2) whether the RISP properly describes the intensity, frequency, and duration of services and supports that are required to meet the individual's needs; (3) whether the RISP, and the services described in the plan, are being implemented consistently across all settings; (4) whether the individual is receiving active treatment; and (5) whether each class member is being provided services in accord with federal regulations and in conformity with Defendants' revised active treatment policy.

4. Starting July 1, 2007, and quarterly thereafter through January 1, 2009, Defendants shall submit a report to the court monitor that describes for each class member the type, intensity (hours/day), frequency (days/week), and provider of each specialized service offered to the individual, the services offered to the person at the nursing facility, and a copy of the person's most recent RISP and plan of care.

IT IS SO ORDERED.